In re MEGAN–RACINE ASSOCIATES, INC., Debtor.

Bankruptcy No. 92–00860.

United States Bankruptcy Court, N.D. New York.

April 19, 1995.

Menter, Rudin & Trivelpiece, P.C., Syracuse, New York (Jeffrey Dove and Mitchell Katz, of counsel), for Debtor.

Swidler & Berlin, Chartered, Washington, DC (Michael L. Shor and William J. Mertens, of counsel), Brian Billinson, Niagara Mohawk Power Corporation, Law Department, Syracuse, New York, for Niagara Mohawk.

Bingham, Dana & Gould, Boston, MA (Sabin Willett, of counsel), for FDIC.

House, Golden, Kingsmill & Reiss, New Orleans, Louisiana (Marguerite Kingsmill, of counsel), Bond, Schoeneck & King, Syracuse, New York (James Dati, of counsel), for Hudson Engineering.

Goldberg & Fabiano, Syracuse, New York (Harold Goldberg, of counsel), for Creditors Committee.

Hancock & Estabrook, Syracuse, New York (Stephen Donato, of counsel), for Kraft.

Michael Collins, Office of the U.S. Trustee, Utica, New York.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Chief Judge.

The within contested matter is before the Court by way of a motion filed by Niagara Mohawk Power Corporation ("NIMO") requesting the escrow of alleged future contract overpayments being made to Megan–Racine Associates, Inc. ("Debtor"). NIMO's motion, filed pursuant to Bankruptcy Code §§ 363(e) and 105(a) (11 U.S.C. §§ 101–1330) ("Code"), is opposed by Debtor, Federal Deposit Insurance Corporation ("FDIC"), as receiver for the New Bank of New England, Hudson Engineering Corporation ("Hud-

son"), Unsecured Creditor's Committee, and Kraft General Foods, Inc. ("Kraft").

At a motion term held in Syracuse, New York on March 21, 1995, the Court heard oral argument on the within motion. NIMO's motion was submitted for decision as of that date.

## JURISDICTIONAL STATEMENT

The Court has core jurisdiction over the parties and the subject matter of this contested matter pursuant to 28 U.S.C. §§ 1334(b), 157(a), (b)(1), (b)(2)(A), (K), and (O).

## FACTS

Congress enacted the Public Utility Regulatory Policies Act of 1978, 16 U.S.C. § 2601 et seq., ("PURPA"), for the purpose of encouraging the development of alternate energy sources. In an effort to achieve the goals of PURPA, the Federal Energy Regulatory Commission ("FERC") and state agencies promulgate regulations whereby public utilities enter into power purchase agreements with qualifying cogeneration facilities ("QF").[1] In order for a facility to be certified as a QF, and hence be eligible to enter into a power purchase agreement, the facility must, among other things, meet certain operating and efficiency standards set forth by FERC. See 18 C.F.R. § 292.205. Under the power purchase agreement, then, a utility purchases the electric energy generated by the QF. Thus, QFs are offered regulatory benefits, namely, favorable rates, for their concomitant obligation to provide efficient, alternate energy sources.

Debtor was formed on March 31, 1987, for the purpose of developing and owning a cogeneration facility ("Facility"). The Facility is a gas fired, topping cycle cogeneration facility which purchases and then burns natural gas in a gas generator. The energy given off as a result of the burning of the natural gas is used to create steam which is then converted to mechanical energy which in turn is used to generate electricity. The Facility's steam is also sold to Kraft, in furtherance of Kraft's food pasteurization process. The Facility was designed with an initial annual capacity of approximately 48.3 megawatts, and an expected annual production of approximately 400,000 megawatt-hours.

On November 21, 1987, Debtor and NIMO entered into a power purchase agreement ("PPA") for the sale and purchase of electric power produced by the Facility. NIMO purchases electrical power from Debtor at $.06 per kilowatt/hour ("6¢ rate"). NIMO alleges, for purposes of the instant motion, that it should only have to purchase power at its applicable tariff rate in Service Classification No. 6, which is approximately $.03 per kilowatt/hour. NIMO seeks to escrow the alleged overpayments, namely, the difference between the 6¢ rate and its tariff rate of $.03 per kilowatt/hour.

On March 17, 1992, Debtor filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. NIMO, alleging that Debtor did not meet its contractual obligation of maintaining QF standards, commenced adversary proceeding 94–70113A ("adversary proceeding") on or about August 1, 1994, against Debtor and FDIC. NIMO's Complaint essentially seeks a declaration that the PPA is null and void and seeks to recover damages.

NIMO filed the instant motion on February 24, 1995, seeking to escrow alleged contract overpayments based on the contention that Debtor did not meet QF standards in 1991 and 1992 and thus is not eligible for the 6¢ rate. Debtor and FDIC filed summary judgment motions in the adversary proceeding on February 28, 1995 and March 15, 1995, respectively. The various motions, oral arguments, as well as continuing discovery, made it clear to the Court that the QF issues involve complex calculations requiring FERC's expertise. The Court, with respect to the summary judgment motions, issued a Memorandum–Decision, Findings of Fact, Conclusions of Law and Order, dated March 24, 1995, ("Memorandum–Decision") staying the adversary proceeding based on the doctrines of primary jurisdiction and exhaustion

---

1. Cogeneration facilities are essentially facilities that produce useful thermal energy (such as steam) in addition to electric power. See 16 U.S.C.A. § 796(18)(A); 18 C.F.R. § 292.202(c).

of administrative remedies. *See In re Megan–Racine Associates, Inc.*, 180 B.R. 375 (Bankr.N.D.N.Y.1995). The Court stayed the litigation in order to allow NIMO to commence proceedings before the FERC to determine certain discrete QF issues. In addition, the Memorandum–Decision held that after the resolution of said issues, the parties were to return to this Court for the litigation of all remaining matters.

## ARGUMENTS

NIMO argues that the price it pays for the electric power purchased from Debtor is fixed by New York law at the greater of the 6¢ rate or NIMO's applicable tariff rate in Service Classification No. 6. The 6¢ rate was established by New York Public Service Law § 66–c which was repealed on June 26, 1992, by the New York General Assembly. *See* NIMO's Memorandum in Support of Motion to Escrow at 5 ("NIMO's Memorandum"). NIMO, however, pays Debtor at the 6¢ rate.

NIMO alleges that cogeneration facilities that entered into contracts prior to June 26, 1992, *and* which were QFs before that date were grandfathered from the repeal of the 6¢ rate. *Id.* at 6. NIMO concedes that Debtor entered into the PPA prior to June 26, 1992. However, NIMO argues that Debtor is not entitled to be grandfathered from the repeal of the 6¢ rate because it did not meet QF standards prior to 1992. Therefore, NIMO should not be required to purchase electricity at the 6¢ rate.

NIMO argues that pursuant to Code §§ 363(e) and 105(a), it is entitled to escrow the difference between the 6¢ rate that it is currently paying and NIMO's applicable tariff rate, which is approximately $.03 per kilowatt/hour. NIMO contends that it has an interest in the alleged overpayments and escrowing these funds will provide it, and its rate-payers, adequate protection. In addition, escrowing the alleged overpayments is in conformance with the purpose of PURPA and New York state policy.

Debtor, FDIC and Hudson argue that NIMO cannot obtain adequate protection pursuant to Code § 363(e). The parties argue that Code § 363(e) may only be used by secured creditors or lessors to obtain adequate protection. As NIMO is neither a secured creditor nor a lessor, it is not eligible for adequate protection.

Debtor, FDIC, Hudson and Unsecured Creditor's Committee also contend that the broad equitable powers granted to the Court under Code § 105(a) cannot be used to create substantive rights, such as granting an otherwise ineligible party adequate protection. In addition, the parties argue that equity dictates that NIMO's motion should be denied. All the parties opposing NIMO argue that escrowing the alleged overpayments will create a financial crisis for Debtor and may terminate the reorganization process. Further, NIMO has waited over two years to make the present motion and the burden to its rate-payers is not substantial.

Debtor and Kraft allege that NIMO's motion is essentially an attempt at summary judgment or prejudgment attachment. Debtor and Kraft argue that neither of these remedies are applicable to NIMO. Therefore, NIMO's motion to escrow alleged contract overpayments should be denied.

## DISCUSSION

Prior to engaging in an analysis of Code provisions, the Court offers a general characterization of NIMO's motion. It is indisputable that NIMO's position in both the present matter and the adversary proceeding is premised on the allegation that Debtor did not meet its contractual and statutory obligations. In the matter, *sub judice,* NIMO argues that Debtor's and FDIC's admissions and other discovery shows beyond dispute that the Facility did not meet QF operating and efficiency standards for calendar years 1991 and 1992. *See* NIMO's Memorandum at 3–4, 6–9. In the adversary proceeding NIMO contends, among other things, that the Facility "failed to meet operating and efficiency standards necessary to qualify as a QF in 1991, 1992, 1993 and/or 1994." *See* NIMO's Pre-trial Memorandum at 6–7.

It appears, then, that the present motion is simply an abridged version of the adversary proceeding. In anticipation of this criticism, NIMO attempts to distinguish the two by arguing that *"regardless of the outcome of*

*the Adversary Proceeding,* there is no justification whatever—now nor any other time—for the 6¢ payments ... to continue." NIMO's Memorandum at 2–3 (emphasis added).

The Court finds NIMO's argument unpersuasive. The relief requested by NIMO in the present motion and in the adversary proceeding requires a determination of QF issues. However, the Court, having become familiar with the complex nature of QF issues, has previously held that these issues ought to be resolved by FERC and on a full plenary trial record. The Court's reasoning is fully articulated in its Memorandum–Decision, dated March 24, 1995.

■■■■ In addition, the Court finds that the instant motion is a veiled attempt at prejudgment attachment. A prejudgment attachment is ancillary to a suit to collect a debt or enforce a lien or other special right. *See generally* Siegel, *New York Practice* § 313 (2d ed. 1991). It has the effect of impounding the debtor's property before judgment to insure the availability after judgment of sufficient assets from which to satisfy the creditor's claim. *See Glotzer v. Glotzer,* 111 Misc.2d 171, 173, 443 N.Y.S.2d 812 (1981). Prejudgment attachment is often used where there is an extended time between the accrual of the claim and entry of a judgment. During this period the debtor may dispose of his property or others may take it in satisfaction of their claims. Therefore, by attaching property which the debtor has an interest in, the creditor creates a security for itself and simultaneously may put pressure on the debtor to settle. *Id.*

NIMO's present motion has the hallmarks of a prejudgment attachment motion. First, NIMO's present motion is ancillary to the adversary proceeding. Second, in escrowing the alleged overpayments, NIMO seeks essentially to impound Debtor's income. Third, NIMO believes that it may be some time before a final resolution of the PPA litigation. *See* NIMO Memorandum at 3 ("realism dictates that it could be some peri-

od of time after trial before final judgment is entered.") Fourth, if successful, NIMO's present motion would give it security in some of Debtor's assets. *See id.* at 14. ("Putting the overpayment amount into escrow will protect Niagara Mohawk and its rate-payers by ensuring that funds to which Niagara Mohawk is unquestionably entitled will be available for distribution, and not spent by the Debtor.")

The Court looks to New York law for the applicable standards governing provisional remedies. *See* Federal Rules of Bankruptcy Procedure ("Fed.R.Bankr.P.") 7064 which incorporates by reference Federal Rules of Civil Procedure ("Fed.R.Civ.P.") 64; *see also In re Feit & Drexler, Inc.,* 760 F.2d 406, 415 n. 2 (2d Cir.1985). New York recognizes that prejudgment attachment is both a harsh and extraordinary remedy which requires strict statutory compliance. New York Civil Practice Law and Rules § 6212; *see Merrill Lynch Futures Inc. v. Kelly,* 585 F.Supp. 1245 (S.D.N.Y.1984). Although NIMO's motion has the hallmarks of a prejudgment attachment motion, the Court cannot grant such relief as NIMO has not even met the minimum requirement of properly pleading its request.

■■■ NIMO refers explicitly and proceeds solely under Code §§ 363(e) and 105(a). NIMO argues that in order to effectuate the policy of Code § 363(e), the Court should escrow all alleged future overpayments under the PPA. The escrowing of the alleged overpayments will provide NIMO with adequate protection and ensure that NIMO receives "the benefit of its pre-bankruptcy bargain." [2]

■■■ Code § 363(*o*)(2) states that in any hearing under Code § 363, "the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest." The determination of lien validity is subject to informal examination and not extensive litigation. *See* 2 Collier on Bankruptcy ¶ 363.15

---

**2.** In its Complaint commencing the adversary proceeding, NIMO alleges that its contractual relationship with Debtor is not "arms length." *See* Complaint at ¶ 15. In the present motion,

NIMO states, somewhat disingenuously, that it seeks adequate protection to preserve the "benefit of its pre-bankruptcy bargain." *See* NIMO's Memorandum at 13.

at 363–45 (15th ed. 1995); *In re Placid Oil Co,* 102 B.R. 538, 542 (Bankr.N.D.Tex.1988). Nevertheless, it is NIMO's burden to demonstrate the interest that is entitled to adequate protection.

Case law has developed two views as to the extent of interest required in order to obtain adequate protection under Code § 363(e). The first view, largely attributable to *In re Sweetwater,* 40 B.R. 733 (Bankr.D.Utah 1984), *aff'd,* 57 B.R. 743 (D.Utah 1985), holds that Code § 363(e) only provides adequate protection to secured creditors. *See also In re Wheeling–Pittsburgh Steel,* 54 B.R. 385 (Bankr.W.D.Pa.1985); *In re Cafe Partners/Washington 1983,* 81 B.R. 175 (Bankr. D.Dist.Col.1988). After a lengthy excursion into the Code's legislative history, the *Sweetwater* court concluded that, "Section 363(e) was intended to protect the collateral of secured creditors while the debtor in possession or trustee operated the business." *In re Sweetwater, supra,* 40 B.R. at 742 (citing *In re Curlew Valley Associates,* 14 B.R. 506, 514 n. 13 (Bankr.D.Utah 1981)).

The second view, which is a more liberal interpretation of Code § 363(e), states that secured creditors as well as lessors are entitled to adequate protection. *See In re De-Santis,* 66 B.R. 998 (Bankr.E.D.Pa.1986). Courts adopting this view contend that the *Sweetwater* analysis "severely restricts the meaning of section 363(e) which, on its face, seems to accord a lessor the right to adequate protection when a debtor decides to use or lease property." *Id.* at 1001–02; *see also In re Braniff Airways, Inc.,* 783 F.2d 1283, 1286 (5th Cir.1986); *In re Inn at Longshore, Inc.,* 32 B.R. 942 (Bankr.D.Conn.1983). However, even courts that apply Code § 363(e) to lessors acknowledge that there is "some force to the *Sweetwater* analysis in the context of executory contracts other than those concerning rentals of realty." *In re*

Grant Broadcasting of Philadelphia, Inc., 71 B.R. 891, 901 (Bankr.E.D.Pa.1987).

Some courts have gone further and anticipated the application of Code § 363(e) to lessors of personal property. *See In re Reice,* 88 B.R. 676 (Bankr.E.D.Pa.1988) (court finding that payment of slightly more than half the total of the original monthly lease payments for laundromat equipment constituted adequate protection). A still more liberal interpretation of what interest in property can receive adequate protection is found in *In re Charrington Worldwide Enterprises, Inc.,* 98 B.R. 65 (Bankr. M.D.Fla.1989), *aff'd,* 110 B.R. 973 (M.D.Fla. 1990) (case does not explicitly refer to Code § 363(e)). The debtor in *In re Charrington* had a contractual obligation to deposit proceeds from the sale of airline tickets in an account and to post a bond in order to cover a draft later presented by the creditor. The court required the debtor to restore the bond for purposes of adequate protection as the creditor "retained ownership or legal title to the blank airline tickets ..." *Id.* at 976.

The 1994 amendment to Code § 363(e) expressly extended its application to lessors of personal property.[3] The 1994 amendment contemplated situations where the estate had not assumed or rejected the lease and yet the debtor was using the property without making the required payments. *See* H.R.Rep. 103–835, 103rd Cong., 2nd Sess. § 220 (Oct. 4, 1994). Arguably, the 1994 amendment clarifies that the *Sweetwater* analysis of Code § 363(e) was too restrictive.

NIMO does not assert that it has a secured claim, that it is a lessor of personal or real property, or that it has retained ownership or legal title to the alleged overpayments.[4] NIMO, rather, is a party to a contract pursuant to which it purchases electricity from Debtor and in return pays Debtor cash.

---

**3.** Code 363(e) was amended by § 219(c) of the Bankruptcy Reform Act of 1994, Pub.L. 103–394 (Oct. 22, 1994). This amendment became effective for all cases commenced after October 22, 1994. Although amended Code § 363(e) does not apply to the present case, the statutory change provides useful insight when determining Congressional intent.

**4.** Ironically, NIMO relies on legislative history which states that " '... the purpose of this section [363] is to ensure that the *secured creditor* receives in value essentially what he bargained for.' " Nimo's Memorandum at 13 (citing H.R. No. 95–595, 95th Cong., 1st Sess. 338–40 (1977)). (emphasis added)

NIMO's interest in the alleged overpayments is contingent on a factual finding that Debtor was not a QF prior to 1992. NIMO's interest is also contingent on a finding that Debtor was not entitled to be grandfathered from the repeal of the 6¢ rate. The conclusion that NIMO's interest is merely contingent is supported by NIMO's own counsel's characterization: "*If* it [Facility] is not qualifying, *if* it is not efficient, it is not entitled to it [alleged overpayments], stop the bleeding." *See* Mr. Shor's Oral Argument at Court's Regular Motion Term in Syracuse, New York on March 21, 1995.

■ This Court cannot find that Code § 363(e) was implemented to provide adequate protection for those holding a contingent interest. Even under a liberal interpretation of Code § 363(e), those entitled to adequate protection have at least a reversionary interest in the property. NIMO's contingent interest in the alleged contract overpayments falls short of such a threshold. Therefore, the Court finds that NIMO has not met its burden of establishing the necessary validity, priority, or extent of its interest.

■ Perhaps because it recognized the dearth of case law and statutory language in support of its position, NIMO turned to the Court's equitable powers as codified in Code § 105(a). NIMO argues that Code § 105(a) grants courts the power to " 'fashion such orders as are necessary to further the substantive provisions of the Bankruptcy Code.' " *See* NIMO's Memorandum at 12 (quoting *Matter of Sadkin*, 36 F.3d 473, 478 (5th Cir.1994)).

■ Although Code § 105(a) grants bankruptcy courts general equity powers, this Court has consistently held that they "can only be exercised within the confines of the Bankruptcy Code." *See In re Bisignani*, 126 B.R. 418, 422 (Bankr.N.D.N.Y.1988) (citing *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 205–07, 108 S.Ct. 963, 968–969, 99 L.Ed.2d 169 (1988)); *F.D.I.C. v. Colonial*

*Realty Co.*, 966 F.2d 57, 59 (2d Cir.1992). Thus, the equitable powers embodied in Code § 105(a) are not to be construed as a license to disregard the clear language and meaning of the bankruptcy statute and rules. *See In re Boyer*, 108 B.R. 19, 24 (Bankr.N.D.N.Y. 1988) (citing *Official Comm. of Equity Sec. Holders v. Mabey*, 832 F.2d 299, 302 (4th Cir.1987)); *In re Joint E. & So. Dist. Asbestos Litigation*, 982 F.2d 721, 751 (2d Cir. 1992).

As a general matter, under the Code each class of creditors is paid off in full according to their non-bankruptcy priority until a class is reached that cannot be paid in full. *See e.g.* Code §§ 725, 726 and 1129(b)(2). The remaining assets are then divided among these creditors pro rata. Claimants holding security interests generally will receive their collateral or its value before any distribution is made to administrative creditors and then, following them, general creditors. *Id.*

In the matter *sub judice*, NIMO does not offer any arguments that it is a secured creditor or even an administrative claimant.[5] Nevertheless, NIMO asks the Court to elevate its status in the creditor hierarchy past other general creditors, administrative claimants and secured creditors by authorizing what is essentially a post-petition preference. This Court finds that Code § 105(a) cannot be used to authorize a financing scheme which is at such fundamental odds with the spirit of the Bankruptcy Code. *See United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir.1986) ("statute does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity"); *compare* Code § 361(3) (adequate protection may not take the form of entitling creditor to an administrative expense).

■ Even *assuming arguendo* that Code §§ 363(e) and 105(a) are the appropriate vehicles for the relief requested, the Court finds that the equities do not favor NIMO.

---

5. Mr. Shor suggested that NIMO may have an administrative claim, however, neither he nor any of NIMO's papers offer support for such a contention. *See* Discussion at Oral Argument at Court's Regular Motion Term in Syracuse, New York on March 21, 1995. (Judge: If you don't have a security interest or a leasehold interest, what are you adequately protecting under 363(e)? Mr. Shor: An administrative claim, perhaps.)

Although the Court has traversed over these grounds previously, it once again offers its reasoning. *See e.g.* Memorandum–Decision, dated March 24, 1995, at 16–17 (Court considered the equities in determining whether to stay the adversary proceeding).

Debtor filed its Chapter 11 petition on March 17, 1992, and yet NIMO waited for over two years to allege that Debtor was not maintaining QF standards. NIMO's response to this criticism is that creditors and Debtor essentially conspired to exclude NIMO from participating in Debtor's bankruptcy case. *See* Complaint at 12–18. The Court does not find this argument persuasive.

The Code offers creditors who have notice of a bankruptcy case, as did NIMO, various procedures by which to actively participate and protect their interests. For example, NIMO could have intervened at any juncture by moving to examine Debtor pursuant to Fed.R.Bankr.P. 2004. In addition, under Fed.R.Bankr.P. 2002(i), NIMO could have requested that all notices be mailed to it. Instead, NIMO slumbered on its rights and now comes to the Court requesting interim relief that, arguably, could dissolve Debtor and torpedo any hope of a successful reorganization. *See* Memoranda in Opposition to NIMO's Motion to Escrow of: FDIC at 8, Debtor at 6, Hudson at 3, Kraft at 2, and Unsecured Creditor's Committee at 2.

NIMO also alleges that the PPA causes its customers to "bear the burden of $1 million a month contract overpayments." *See* NIMO's Memorandum in Response to Megan–Racine's Motion to Stay the Proceedings or Summary Judgment at 3 and 20. In addition, NIMO's Complaint in the adversary proceeding alleges that it represents "the interest of 1.2 million rate-payers . . ." *See* Complaint at 16, ¶ 54. *Assuming arguendo* that the Court has a statutory basis for considering the impact on NIMO's rate-payers, the Court cannot find that a burden of less than $1 per month, per rate-payer out-

weighs the immediate harm that would result to the creditors, equity holders and Debtor if the alleged overpayments were escrowed.[6]

Finally, the Court notes that its decision to stay the adversary proceeding and allow NIMO to bring forth certain discrete QF issues to FERC should not substantially delay a final determination of the PPA. The Court so concludes because the parties have indicated that discovery is essentially complete, the issues are defined, and the data to be presented to FERC is agreed upon. *See* Memorandum–Decision, dated March 24, 1995, at 17. Further, the Court has had an informal discussion with FERC for the limited purpose of determining the proper procedural mechanism by which to "certify" QF issues. FERC has indicated a willingness to resolve the issues left to it by the Court on an expedited basis.

Accordingly, it is hereby

ORDERED that NIMO's motion pursuant to Code §§ 363(e) and 105(a) for the escrow of alleged future contract overpayments is denied.

---

6. Without minimizing the effect on rate-payers, it is arguable that Congress did not intend Bankruptcy Courts to consider the public welfare in the context of corporate reorganizations. *Compare* Code § 1165 (This Code section specifically mandates courts to consider the public interest within the context of railroad reorganizations. Such a requirement is conspicuously missing with respect to corporate reorganizations.)