**In re MAGNESIUM CORPORATION OF AMERICA, et al., Debtors.**

**No. 01–14312 REG.**

United States Bankruptcy Court, S.D. New York.

May 24, 2002.

Chadbourne & Parke LLP, by Joseph H. Smolinsky, John O'Sullivan, Michael B. Guss, New York City, for Debtors.

Stoel Rives LLP, by Richard C. Josephson, Per A. Ramsfjord, Jeannette L. Cotting, Portland, OR, Carabba Locke LLP, by Anthony Carabba, New York City, for PacifiCorp.

### MEMORANDUM OPINION AND ORDER WITH RESPECT TO DISPUTES REGARDING ELECTRICITY RATES

ROBERT E. GERBER, Bankruptcy Judge.

#### Introduction

Magnesium Corporation of America ("MagCorp"), the debtor in this case under chapter 11 of the Bankruptcy Code, consumes electricity, as part of its manufacturing processes, in prodigious quantities. It purchases that electricity from PacifiCorp, doing business as Utah Power & Light Co.

Before the Court are two related contested matters. As narrowed by subsequent agreement on PacifiCorp's part,[1] they collectively present issues as to the extent to which this Court—in contrast to the Utah Public Service Commission ("Utah PSC")—should determine:

---

1. In addition to using electricity, MagCorp has the ability to generate its own, and contends that it is a "qualifying facility" ("QF") under the Public Utilities Regulations Policy Act of 1978, 16 U.S.C. § 824a–3, *et seq.* ("PURPA"). MagCorp originally also sought an order requiring PacifiCorp to *purchase* electricity generated by MagCorp, at PacifiCorp's "avoided cost," as federal law requires. PacifiCorp has since agreed that it will do so, thereby making that part of the controversy moot.

(1) whether PacifiCorp has the duty under (a) earlier order of the Utah PSC, or (b) federal law, to provide "Interruptible Service" to MagCorp (which, if PacifiCorp has such a duty, would result in a dramatically lower rate structure for MagCorp, to the disadvantage of PacifiCorp); and

(2) the particular rates under which PacifiCorp would provide electricity to MagCorp, under any particular scenario.

Assuming that the Court can determine any of those issues, the two matters then present the questions as to what the determinations should be.

They also involve the extent to which MagCorp should now be required to pay:

(3) part or all of the higher electric rates PacifiCorp desires, before final determinations are made with respect to the appropriate rates to be charged, as administrative expenses under section 503(b) of the Code (or, alternatively, to escrow them); and

(4) an increased deposit as "adequate assurance" of payment under section 366 of the Code.[2]

Determination of the first two issues requires consideration of the doctrine of "primary jurisdiction"—whether this Court should abstain from the exercise of any jurisdiction it might otherwise have, so as to defer to administrative agencies (such as the Utah PSC) who might be better equipped to deal with them, or whose determination with respect to them might be required as a matter of law. Determination of the latter two issues involves consideration of bankruptcy law, and whether the estate and its creditors should be prejudiced by the self-help of PacifiCorp, and based on PacifiCorp's predictions as to determinations to be made by the Utah PSC, when PacifiCorp has no present rights in that regard.

For the reasons set forth below, the Court concludes, with respect to those issues:

(1)(a) Whether or not MagCorp has an entitlement to Interruptible Service by earlier order of the Utah PSC is best determined by the Utah PSC, and the Court considers it appropriate, under the doctrine of primary jurisdiction, to defer to the Utah PSC with respect to that issue.

(1)(b) Once again considering the doctrine of primary jurisdiction, the Court comes to a different conclusion with respect to MagCorp's claim that it has a statutory right to Interruptible Service under PURPA, and/or regulations there-

---

**2.** Those issues are presented in the context of two separate motions for relief, brought by each of the two warring parties. MagCorp moves, pursuant to sections 362 and 366 and of the Code, asserting that such is necessary to protect its property under the automatic stay ("Stay") and its rights under earlier orders of this Court relating to utility payments, for an order (1) requiring PacifiCorp to provide Interruptible Service; (2) modifying the Stay to the extent necessary to allow the Utah PSC to determine the "Interruptible Rate"— the rate to be charged for electricity to be provided to MagCorp, on the premise that MagCorp will have Interruptible Service; and (3) imposing sanctions on PacifiCorp, by reason of PacifiCorp's unilateral determination

to take away MagCorp's Interruptible Service, and PacifiCorp's consequential raising of the rates by which PacifiCorp billed MagCorp for electrical service, without first obtaining an order of the Utah PSC or this Court.

PacifiCorp, in turn, has moved, pursuant to sections 503(b) and 366 for an order (1) compelling compliance with a stipulation that PacifiCorp contends requires MagCorp to pay additional amounts demanded by PacifiCorp for "adequate assurance" of utility payment; (2) directing MagCorp to pay unpaid charges after PacifiCorp raised its rates; and (3) requiring MagCorp to pay an increased deposit corresponding to the new, higher rates, that PacifiCorp contends it may collect.

under. This involves straightforward statutory construction, without the need to engage in fact-finding turning on technical evidence, use of agency expertise, exploitation of localized knowledge, or solicitation of public comment. The Court determines that under 18 C.F.R. § 292.305(b)(1), MagCorp is now entitled to Interruptible Service, subject to change if the Utah PSC (which appropriately may consider the matter) later concludes that MagCorp is not entitled to Interruptible Service, by reasons of waivers in favor of PacifiCorp that the Utah PSC would have the power to grant under 18 C.F.R. § 292.305(b)(2).

(2) Once more considering the doctrine of primary jurisdiction, the Court concludes that the particular rates to be charged for MagCorp's future service, for Interruptible Service (if MagCorp continues to be entitled to it) or otherwise, should be determined by the Utah PSC, and the Court will modify the Stay, to the extent necessary, to permit the Utah PSC to do so.

(3) PacifiCorp's request for payment, as an administrative expense, of any additional amounts that PacifiCorp contends to be due to it (as a consequence of its having raised its rates before approval thereof by the Utah PSC, and based on a non-Interruptible Service rate) or, alternatively, for an escrow of such payments, is denied, without prejudice to renewal after action by the Utah PSC. However, PacifiCorp's request for payment, as an administrative expense, of such amounts, if any, that would be due to it whether or not it had raised its rates is granted.

(4) PacifiCorp's request for an increase in its deposit, as adequate assurance of future payment by MagCorp, is denied, without prejudice to renewal after the Utah PSC has made any relevant determinations with respect to the foregoing.

The following are the Court's Findings of Fact, Conclusions of Law, and bases for the exercise of its discretion in connection with the motions.

*Facts*

The underlying facts are not in dispute, and the two sides have agreed that the issues may be heard on affidavits, exhibits and briefs, and without an evidentiary hearing.

MagCorp is the last remaining domestic magnesium producer in the United States. It is situated along the Great Salt Lake in Utah, and utilizes electrolysis to extract magnesium. As a result, electricity and power costs are among MagCorp's highest costs. MagCorp purchases its electricity from PacifiCorp. Additionally, MagCorp has the ability to generate some of its own power.

For many years, MagCorp has purchased what is known as "Interruptible Service" from PacifiCorp. Interruptible Service is service that can be cut off, as a matter of right, by the power company—as, for example, the power company might choose to do if its grid is overburdened. Interruptible Service can be contrasted to (a) "firm" service, where the utility continually supplies the customer with power (and, at least in the great bulk of cases, cannot cut off service), and (b) "back-up" service, where the utility provides only back-up service to a customer that usually generates its own power supply.[3] Inter-

---

**3.** Interruptible Service can also be contrasted to "maintenance" service, where the utility provides service only when the customer's own generator is out of service for scheduled maintenance. However, such service was not

ruptible service is far cheaper than other types of electric service, and having an inexpensive power supply has been an important component of MagCorp's business plan since its inception.

PacifiCorp supplies Interruptible Service to MagCorp under the direction of a "Report, Findings and Conclusions"[4]—referred to by PacifiCorp as the "Report" and by MagCorp as the "1968 Order," and by this Court as the "1968 RF & C"—of the Utah PSC. The 1968 RF & C provided, in relevant part:

That Utah Power and Magnesium Project [ (MagCorp's predecessor) ] should be directed to negotiate and enter into a contract to be presented to this Commission for approval in which Utah Power agrees to furnish Magnesium Project 80 megawatts of power and energy *with no guaranteed availability* at a rate of 3.1 mills per kilowatt hour...

It further provided:

That the Commission should retain jurisdiction over Utah Power's rate for *interruptible service* to Magnesium Project ...

1968 RF & C at 57 (emphasis added). During the course of the parties' relationship, MagCorp purchased power from PacifiCorp on an interruptible basis.

PacifiCorp and MagCorp entered into an agreement in 1968 (the "1968 Agreement")—presumably the one contemplated by the 1968 RF & C—which was thereafter amended eight times. The eighth amendment to the 1968 Agreement ("Eighth Amendment") provided that

"[t]his Agreement shall terminate at midnight on December 31, 2001."[5] No further agreement was entered into to extend it or substitute a new one, and as a consequence, PacifiCorp and MagCorp now do business without a written contract in place.

On January 12, 1998, the Utah PSC issued an order approving the Eighth Amendment (the "Eighth Amendment Order"). In the Eighth Amendment Order, the Utah PSC noted that "the amendment has a specific termination date with no automatic renewal provision," and that "any extension of the contract should be filed at least 120 days before its termination date."[6] The Eighth Amendment Order included provisions whose significance is in dispute. It provided, among other things, that:

The Agreement ... is hereby approved ... with the following conditions:

. . .

C. Any repricing of the Agreement shall require prior Commission approval.

D. UP & L shall obtain Commission approval of any Agreement extension....

*Id.*

Without dispute, at least at this time, MagCorp is a QF.[7] It has a generator capable of producing 40 megawatts of electrical energy, and thus would not just be a buyer of electricity; it also would be a seller. PacifiCorp would purchase energy from MagCorp at PacifiCorp's "avoided cost,"[8] and after some uncertainty in this

---

requested by MagCorp or offered by PacifiCorp in this case.

**4.** Aff. of Bruce Griswold, dated April 5, 2002 ("Griswold Aff."), Exh. A ("1968 RF & C").

**5.** Griswold Aff. Exh. J at § 1.

**6.** Griswold Aff. Exh. K, 1998 Utah PUC LEXIS 114.

**7.** *See* PacifiCorp Opposition Br. at 9, 13–14; PacifiCorp Supp. Br. at 5, 6.

**8.** At the risk of being overly simplistic, "avoided cost" is the incremental cost of producing power.

regard, has now led this Court to understand that it will to do so in the future.

*Recent Proceedings before the Utah PSC*

The Utah PSC has noted that the interpretation of the 1968 Agreement has been a continuing source of controversy between the parties,[9] and MagCorp and PacifiCorp have a history of appearances before the Utah PSC. The Utah PSC has approved all eight of the amendments to the 1968 Agreement.

On December 14, 2001, PacifiCorp filed an application with the Utah PSC for the approval of provisions relating to its supply of electric service to MagCorp (the "PacifiCorp Application").[10] In its application, PacifiCorp stated that it "has not offered MagCorp a special contract for interruptible service at a discounted price." Instead, PacifiCorp offered to provide MagCorp with either firm service or back-up service. PacifiCorp stated in its application that Interruptibility should be the subject of separate agreements.

MagCorp responded to the PacifiCorp Application, and the Utah PSC issued a scheduling order that was agreed upon by all the parties, including MagCorp. So far as the record reflects, the PacifiCorp Application is currently pending before the Utah PSC.[11]

Subsequently, on January 17, 2002, MagCorp filed a petition with the Utah PSC, asserting that it was a QF and thus that PacifiCorp was compelled to purchase power from MagCorp's generating facilities pursuant to PURPA.[12] That petition appears likewise to be pending, although it is not clear to the Court whether this is still a matter of dispute.

*Proceedings in this Court*

After filing its petition, MagCorp obtained two relevant orders from this Court: a Utility Order and an Automatic Stay Order. These bolstered the protections afforded to MagCorp by the automatic stay and section 366 of the Bankruptcy Code.

The Utility Order stated, in relevant part:

> ORDERED, that the Utility Companies are prohibited from altering, refusing or discontinuing service; and it is further
>
> . . .
>
> ORDERED, that if a Utility Company objects . . . and requests additional adequate assurance that the Debtors believe is unreasonable, the Debtors will file a motion for Determination of Adequate Assurance Payment . . . and set such motion for hearing . . .

Utility Order at 1–2.

In accordance with the procedure set forth in the Utility Order, MagCorp and PacifiCorp entered into a stipulation with respect to adequate assurance for PacifiCorp (the "Utility Stipulation"), which was "so ordered" by this Court on November 27, 2001. It granted PacifiCorp limited relief from the automatic stay to allow PacifiCorp to set-off amounts due by it to MagCorp against amounts due to PacifiCorp from MagCorp. Additionally, MagCorp agreed to provide PacifiCorp with a deposit of $485,000 (about half a month's supply of electricity) and to prepay for its electricity in bimonthly payments of $485,000. The Utility Stipulation

---

**9.** Griswold Aff. Exh. K, 1998 Utah PUC LEX-IS 114, *1.

**10.** *See* Griswold Aff. Exh. N.

**11.** *See* Griswold Aff. Exh. O.

**12.** Pursuant to PURPA, QF's, can require utilities to purchase their excess capacity at the utilities avoided cost.

further called for a true-up at the end of every month.

Recognizing that the 1968 Agreement was about to expire on December 31, 2001 (about a month after the Utility Stipulation was so ordered), and anticipating that the rate for MagCorp's electricity would change after the expiration of the 1968 Agreement, MagCorp and PacifiCorp agreed to provisions dealing with possible changes in circumstances:

> On January 1, 2002, the Deposit will be increased or decreased, as applicable, in an amount equal to the percentage increase or decrease in power rates after January 1, 2002 for the 80 MW currently being provided under the Power Purchase Agreement over the rates specified in the agreement.
>
> . . .
>
> . . . PacifiCorp shall not be prejudiced by virtue of this Stipulation from seeking additional adequate assurance based on a material change in circumstance.

Utility Stipulation at ¶¶ 6(e) & 7.

At the end of 2001, as noted, the parties had no successor agreement in place, and PacifiCorp reacted to the termination of the 1968 Agreement in a number of ways. As noted above, on December 14, 2001, PacifiCorp filed an application with the Utah PSC seeking to increase the rate it could charge. But without waiting for a determination by the Utah PSC, PacifiCorp billed MagCorp for electric service during the month of January 2002 at PacifiCorp's "Schedule 9 Rate," a higher rate which was one of its published rates for other customers. When MagCorp complained that charging it at that rate

violated the Utility Order and the Utility Stipulation, PacifiCorp sent a "corrected" invoice to MagCorp, charging the former rate.

Finally, without seeking an order of this Court reexamining the amount of the adequate assurance deposit that had been fixed in the Utility Stipulation and so ordered by the Court, PacifiCorp invoiced MagCorp for an increase in the deposit as a consequence of the higher rates PacifiCorp would charge.

*Discussion*

*I.*

*Threshold Issues*

■ MagCorp's section 362 contentions are based principally on section 362(a)(3), interference with the property of the estate, and on the premise that interference with rights created by federal statute that are the property of the estate—such as the right to Interruptible Service, at attractive rates, that MagCorp contends to exist—is a prohibited interference with estate property. It is true, at least in this Circuit, that federally created rights can be property of the estate, which can be protected under the automatic stay. *See The Official Committee of Unsecured Creditors v. PSS Steamship Company, Inc. (In re Prudential Lines, Inc.),* 928 F.2d 565, 568 (2d Cir.1991); *The Official Committee of Unsecured Creditors v. PSS Steamship Company, Inc. (In re Prudential Lines, Inc.),* 107 B.R. 832, 841–843 (Bankr. S.D.N.Y.1989).[13]

While PacifiCorp disputes that it has acted in violation of any of MagCorp's

---

**13.** The Bankruptcy Court issued a decision, cited here, as well as a subsequent decision implementing its first decision. It was the second, implementing, decision that was affirmed by the District Court, which, in turn, was affirmed by the Second Circuit. *See The*

*Official Committee of Unsecured Creditors v. PSS Steamship Company, Inc. (In re Prudential Lines, Inc.),* 114 B.R. 27 (Bankr.S.D.N.Y. 1989), *aff'd* 119 B.R. 430 (S.D.N.Y.1990), *aff'd* 928 F.2d 565, 568 (2d Cir.1991).

rights (state or federal), and further disputes any act to violate the stay or the right of MagCorp to recover sanctions, PacifiCorp does not quarrel with the proposition that there might be an interference under section 362(a)(3) if there were interference with the federally created right that is alleged to exist. Accordingly, the Court assumes, without ruling on the matter, that if MagCorp has the ability to show the violation of the rights it alleges, it has the ability to protect them under section 362.

## II.

### *Interruptibility*

MagCorp contends that is entitled to Interruptible Service for two analytically distinct reasons. It argues that it is entitled to Interruptible Service under (1) the 1968 RF & C, and (2) under PURPA and the regulations thereunder.

PacifiCorp disputes that MagCorp is entitled to Interruptible Service on either of the argued bases, and contends, in addition, that under the doctrine of primary jurisdiction, any decision with respect to either argument should be made by the Utah PSC and not by this Court.

### (a) Primary Jurisdiction Principles

■ The doctrine of primary jurisdiction is considered in instances where the enforcement of a claim "requires the resolution of issues that, under a regulatory scheme, have been placed within the special competence of an administrative body." [14] It allows a federal court to refer a matter extending beyond the "conventional experiences of judges" or "falling within the realm of administrative discretion" to an administrative agency with more specialized experience, expertise, and insight.[15] "[C]ourts apply primary jurisdiction to cases involving technical and intricate questions of fact and policy that Congress has assigned to a specific agency," [16] as:

> Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure.

*Far East Conference v. United States*, 342 U.S. 570, 574–575, 72 S.Ct. 492, 96 L.Ed. 576 (1952). Another aim of the doctrine is to "ensure that courts and agencies with concurrent jurisdiction over a matter do not work at cross purposes." [17]

■ No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation.[18]

---

14. *United States v. Western Pacific RR Co.,* 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956) ("*Western Pacific*"); *accord Fulton Cogeneration Assocs. v. Niagara Mohawk Power,* 84 F.3d 91, 97 (2d Cir.1996) ("*Fulton Cogeneration*") (quoting *Western Pacific*).

15. *National Communications Ass'n, Inc. v. American Tel. and Tel. Co.,* 46 F.3d 220, 222–223 (2d Cir.1995).

16. *Id.* at 223.

17. *Fulton Cogeneration,* 84 F.3d at 97.

18. *Western Pacific,* 352 U.S. at 64, 77 S.Ct. 161.

Particularly relevant to this Court's determinations on this motion are several decisions in this Court's sister district, applying the doctrine of primary jurisdiction with respect to some issues; not applying it with respect to others; and dealing with proceedings in the bankruptcy court while matters relating to the first two categories were pending.[19] Those decisions, all by Chief Judge Gerling of the Northern District of New York, in another case involving disputes between a debtor and power company when matters of electrical power regulation were involved,[20] provide a useful roadmap for deciding the issues faced by this Court.

■ As noted in *Megan–Racine I*, factors that have been judicially recognized as appropriate to examine when determining whether to apply the doctrine of primary jurisdiction include whether:

(1) the question at issue is within the conventional experience of judges;

(2) the issue lies in the agency's discretion or is within the agency's particular expertise;

(3) there exists a danger of inconsistent rulings; and

(4) a prior application to the agency has been made.[21]

Application of these factors gives rise to the result that primary jurisdiction should be applied to some of the Interruptible Service issues, but not all of them. The analysis follows.

*(b) Application of Primary Jurisdiction Factors*

*(1)(a) Rights Arising from the 1968 RF & C*

■ MagCorp first contends that it has the right to Interruptible Service as a consequence of determinations made by the Utah PSC in the 1968 RF & C, and in

**19.** *See Niagara Mohawk Power Corp. v. Megan–Racine Assocs., Inc. (In re Megan–Racine Assocs., Inc.)*, 180 B.R. 375 (Bankr.N.D.N.Y. 1995) *("Megan–Racine I")* (staying adversary proceeding with respect to disputes under power purchase agreement under which utility purchased power from debtor, pending determination of issues by Federal Energy Regulatory Commission ("FERC") under doctrine of primary jurisdiction); *In re Megan–Racine Associates, Inc.*, 192 B.R. 321 (Bankr. N.D.N.Y.1995) *("Megan–Racine II")* (denying motion of power company to escrow payments due to the debtor under power purchase agreement); *In re Megan–Racine Assocs., Inc.*, 203 B.R. 873 (Bankr.N.D.N.Y. 1996) *("Megan–Racine III")*(construing New York statute, and determining appropriate rate to be paid by utility to debtor under power purchase agreement under New York State law), *rev'd* 198 B.R. 650 (N.D.N.Y.1996) *(Megan–Racine III–District)*, *rev'd and bankruptcy court decision aff'd*, 102 F.3d 671 (2d Cir.1996) *("Megan–Racine III–Circuit")*.

**20.** The *Megan–Racine* decisions involved a case in which a power company (Niagara Mohawk, defined as "NIMO" in the deci-

sions) was required, under a power purchase agreement, to buy electric power from the debtor Megan–Racine (1) if, but only if, Megan–Racine was deemed to be a QF, and (2) at a price that was subject to dispute, by reason of disputes as to the retroactivity of a New York statute setting the rates. With respect to the first of those issues, Judge Gerling applied the doctrine of primary jurisdiction to defer to FERC, but with respect to the second of them, he simply decided the statutory construction issue, and was ultimately affirmed by the Second Circuit on the merits.

While in the *Megan–Racine* cases the debtor was a seller of electricity, rather than a buyer, and they thus involved different energy regulatory issues, the analysis in those cases, particularly *Megan–Racine I*, is highly relevant. For understandable reasons, the *Megan–Racine* cases are cited and discussed at length by both parties here.

**21.** *Megan–Racine I*, 180 B.R. at 381, *citing Oasis Petroleum Corp. v. Department of Energy*, 718 F.2d 1558 (Temp.Emer.Ct.App.1983); *Kansas–Nebraska Natural Gas Co., Inc. v. Marathon Oil Co.*, 109 F.R.D. 12, 28 (D.Neb. 1983).

particular, the language in the 1968 RF & C:

> That Utah Power and Magnesium Project [ (MagCorp's predecessor) ] should be directed to negotiate and enter into a contract to be presented to this Commission for approval in which Utah Power agrees to furnish Magnesium Project 80 megawatts of power and energy *with no guaranteed availability* at a rate of 3.1 mills per kilowatt hour. . .

and:

> That the Commission should retain jurisdiction over Utah Power's rate for *interruptible service* to Magnesium Project . . .

1968 RF & C (emphasis added). The parties spar over the meaning of this language, and in particular whether the 1968 RF & C itself confers the rights upon which MagCorp relies. They also argue as to whether MagCorp derives rights under the Eighth Amendment Order.

Determination of these issues—and in particular, what the Utah PSC had in mind when it used the language it did, what rights it conferred as a consequence, and whether rights under the 1968 RF & C have expired—is in this Court's view a classic case for application of the doctrine of primary jurisdiction. Applying the factors identified in *Megan–Racine I, see* 180 B.R. at 381, strongly supports deferring to the Utah PSC with respect to what it meant, and what import any determinations it made should have.

The first factor—the conventional expertise of judges—tilts in favor of deferring to the Utah PSC. While courts sometimes interpret orders and/or findings of other tribunals, the tribunal that issued the order and/or findings is frequently best capable of knowing its intent and the rights its determination was to confer. That is particularly so in cases like this one where the agency is more familiar than the court with the statutory, procedural and factual contexts in which the agency issued its determinations.

The second factor—agency expertise—leads to the same conclusion, perhaps even more strongly, for the reasons just mentioned, and the additional one that the Utah PSC would know far better than this court what its determinations were supposed to signify in the context of Utah's rate regulation scheme.

The third factor—the danger of inconsistent rulings—once more leads the Court to the same conclusion. Courts and administrative agencies analyze the import of their own earlier rulings as a matter of course, and this Court is reluctant to take any action that would deprive the Utah PSC of that right. Yet if this Court were to attempt to construe the Utah PSC's 1968 RF & C, such an effort by this Court would raise equally undesirable risks of res judicata (inappropriately tying the hands of the Utah PSC) or, alternatively, inconsistent results. Neither of those alternatives, in this Court's view, is consistent with justice or thoughtful judicial administration.

The fourth factor—prior application to the agency—dictates the same result. It appears here that by reason of proceedings initiated by PacifiCorp on December 14, 2001, determinations as to the import of the 1968 RF & C, and/or the Eighth Amendment Order, likely will be considered by the Utah PSC. Even if the issues related to those matters are not already squarely before the Utah PSC, there has been no suggestion that the Utah PSC could not or would not consider them.

Accordingly, the Court concludes that whether or not MagCorp has an entitlement to Interruptible Service by earlier determination of the Utah PSC is best

determined by the Utah PSC, and the Court considers it appropriate, under the doctrine of primary jurisdiction, to defer to the Utah PSC with respect to that issue.

### (1)(b) Rights Under PURPA and Regulations Thereunder

■ The Court's determination differs with respect to MagCorp's claim that it also has a statutory right to Interruptible Service under PURPA, and/or regulations thereunder. MagCorp bases its claim under a regulation enacted under PURPA, 18 C.F.R. § 292.305(b) ("Section 305(b)"), whose subsection (b)(1) provides in substance that upon request, utilities "shall provide" interruptible power to a QF.[22] PacifiCorp does not dispute what Section 305(b)(1) says, or means, though PacifiCorp argues that Section 305(b)(2) goes on to provide for a mechanism under which the Utah PSC could grant it a waiver of that obligation.[23] MagCorp contends, in turn, that while such a mechanism exists, the utility can be relieved of its obligation to provide interruptible service to a QF

only if it affirmatively requests such relief, and that PacifiCorp, as yet, has made no such request.[24]

Section 305(b) is not at all difficult to understand or construe, or to apply to facts which here are undisputed. The Court need do no more with Section 305(b) than apply subsection (b)(1) in accordance with its plain meaning, and honor any determination made by the Utah PSC, if it later makes one, under subsection (b)(2). Here the question at issue is within the conventional experience of judges; the issue does not lie in the agency's discretion or within the agency's particular expertise; there exists no danger of inconsistent rulings, and no prior application to the agency has been made.

Thus the primary jurisdiction analysis with respect to Section 305(b), while governed by the same principles as those with respect to the 1968 RF & C, yields a different result. Matters relating to the application of Section 305(b) involve straightforward statutory construction (and, if later applicable, implementation of

---

**22.** Section 305(b) provides in full:
(b) Additional Services to be Provided to Qualifying Facilities.
(1) Upon request of a qualifying facility, each electric utility shall provide:
(i) Supplementary power;
(ii) Back-up power;
(iii) Maintenance power; and
(iv) Interruptible power.
(2) The State regulatory authority (with respect to any electric utility over which it has ratemaking authority) and the Commission (with respect to any nonregulated electric utility) may waive any requirement of paragraph (b)(1) of this section if, after notice in the area served by the electric utility and after opportunity for public comment, the electric utility demonstrates and the State regulatory authority or the Commission, as the case may be, finds that compliance with such requirement will:
(i) Impair the electric utility's ability to render adequate service to its customers; or

(ii) Place an undue burden on the electric utility.

**23.** PacifiCorp states, in its opposing brief, that "MagCorp is correct that 18 C.F.R. § 292.305(b)(1) provides that upon request, utilities 'shall provide' interruptible power to a QF...." PacifiCorp goes on to note, however, that there is a mechanism under which utilities can secure waivers of this requirement, as provided in 18 C.F.R. § 292.305(b)(2), quoted along with the subsection that precedes it, above. (*See* PacifiCorp Opposition Br. at 13–14).

**24.** *See* MagCorp Reply Br. at 6. MagCorp also contends that PacifiCorp would bear the burdens in this regard, and that the chances that PacifiCorp could satisfy subsection (b)(2)'s requirements for such a waiver are remote; the Court need not, and does not, address MagCorp's contentions in this regard.

any subsequent Utah PSC decision) without the need to engage in fact-finding turning on technical evidence, use of agency expertise, exploitation of localized knowledge, or solicitation of public comment.

In such circumstances, the courts in this Circuit, including the Second Circuit, have construed an applicable statute, even though the statutory construction had an effect on energy policy and came close to issues that might be regarded by some as appropriate for administrative agencies to decide. In *Megan–Racine III*, the right of the debtor, a QF and seller of power, to receive a minimum rate for it under a New York statute [25] was subject to dispute; the issue would turn on the construction of the New York statute, and in particular whether contracts entered into before a legislative amendment repealing the minimum rate might be "grandfathered." *See* 203 B.R. at 879.

While in *Megan–Racine I*, Judge Gerling had deferred to FERC under the doctrine of primary jurisdiction, in *Megan–Racine III*, he did not do so. He stated, in that connection:

> As the instant dispute calls for reading and analysis of a state statute, this Court is an appropriate forum and will apply the law of New York. . . . The Court further notes that an interpretation of this statutory section does not require the specialized knowledge of an administrative agency, namely, the New York Public Service Commission ("PSC").

203 B.R. at 878 (citation omitted). He expressly contrasted his decision in that regard to his decision in *Megan–Racine I*. *See id.* ("*compare* Summary Judgment Decision, *supra,* 180 B.R. at 380–383 (referring regulatory matters requiring administrative expertise to FERC)").

While Judge Gerling's *Megan–Racine III* decision was reversed by the district court,[26] the district court's decision was reversed, in turn, by the Second Circuit, and Judge Gerling's *Megan–Racine III* decision was reinstated. None of the higher courts expressed the view that Judge Gerling was incorrect in *Megan Racine III* when he ruled on the statutory construction issue,[27] and the Second Circuit ultimately agreed with his determination on the merits.[28]

Since the dispute here calls for the reading and analysis of a statute, and interpretation of Section 305(b) does not require the specialized knowledge of an administrative agency, *see Megan–Racine III*, 203 B.R. at 878, this Court sees no need to defer to the Utah PSC with respect to the plain meaning of Section 305(b). PacifiCorp's efforts to distinguish *Megan–Racine III*[29] rest on a blending of the separate issues of Interruptibility under the 1968 RF & C and under Section 305(b). When the separate issues are appropriately parsed and Section 305(b) issues are considered for what they are, *Megan–Racine III* is not in any way distinguishable. This Court determines that under 18 C.F.R. § 292.305(b)(1), MagCorp is now entitled to Interruptible Service, subject to change if the Utah PSC later concludes that MagCorp is not entitled to Interrupti-

**25.** N.Y. Public Service Law § 66–c(2).

**26.** *See Megan–Racine III–District, rev'd in Megan–Racine–III–Circuit.*

**27.** *See Megan–Racine III–District,* 198 B.R. at 651; *Megan–Racine III–Circuit,* 102 F.3d at 672.

**28.** *See Megan–Racine III–Circuit,* 102 F.3d at 677.

**29.** PacifiCorp Supp. Br. at 8.

ble Service, by reasons of waivers in favor of PacifiCorp that the Utah PSC would have the power to grant under 18 C.F.R. § 292.305(b)(2).

### (2) Rates to be Set

■ The final primary jurisdiction issue relates to who should set the actual rates to be charged, and, as a variant of that, who should decide how any right to Interruptible Service should be implemented as part of the rate structure. With respect to the first issue, MagCorp understandably agrees that the Utah PSC should fix the rates, and while MagCorp is silent with respect to the second issue, the Court believes that the Utah PSC should make that determination as well.[30] The setting of electrical rates is a classic administrative agency function, which, for understandable reasons, is left to agencies with the technical knowledge of the industry, local conditions, and the economics of utility pricing. It is beyond the usual expertise of judges; is one where the agency brings particular expertise; and where a prior application to the agency has already been made. If this Court were actually to consider setting the rates, there would also be the danger of inconsistent rulings. These considerations would be equally true, in all material respects, with respect to the technically narrower, but still ar-

cane, issue as to how to implement the right to Interruptible Service if the Utah PSC does not give PacifiCorp a waiver.

Accordingly, the Court concludes that the particular rates to be charged for MagCorp's future service, for Interruptible Service (if MagCorp continues to be entitled to it) or otherwise, should be determined by the Utah PSC, and the Court modifies the Stay, to the extent necessary, to permit the Utah PSC to do so.[31]

### III.

### Section 362 Issues

■ For the reasons described above, the Court concludes that MagCorp has a federally protected right—to Interruptible Service, under Section 305. As discussed in Section I, above, that right is property of MagCorp's estate, and is entitled to protection under section 362.

The Court is not at all pleased with PacifiCorp's resort to self-help with respect to its denial of Interruptible Service, increase in its invoiced rates, and its invoiced request for an increased deposit. However, the underlying legal issues with respect to this have been sufficiently murky for this Court to be loath to find a violation of the automatic stay on PacifiCorp's part, much less an intentional one.[32]

---

**30.** Thus, if the Utah PSC concludes that Interruptible Service must still be provided, the Court considers the Utah PSC better suited than this Court to determine how Interruptible Service should be implemented—including, by way of example, whether it should be implemented within or outside of existing rate schedules, and whether or not by separate agreement.

**31.** However, the extent to which any determination by the Utah PSC as to the appropriate rate shall be retroactive is left for another day, along with any decisions as to whether modification of the Stay is appropriate to allow that decision to be made by the Utah

state courts, Utah PSC, or some other non-bankruptcy forum. If any party wishes any forum other than this Court to deal with that issue (at such time, if ever, that it becomes relevant and the necessary predicates for determining such an issue have fallen into place), it can seek further relief from this Court, addressing factors relevant to requests for relief from the stay, or modification of it, to permit litigation to proceed in another forum. *See In re Sonnax Industries, Inc.*, 907 F.2d 1280, 1286 (2d Cir.1990).

**32.** *See In re Dabrowski*, 257 B.R. 394, 416 (Bankr.S.D.N.Y.2001) (landlord's actions, alleged to violate section 524 injunction, evi-

The Court does, however, expect that PacifiCorp personnel in the future will not unilaterally change rates or demand increased deposits without consulting with counsel first, and, if necessary, seeking an order from this Court. The Court would be much less likely to find any future acts to be unintentional.

## IV.

### Section 503(b) and 366 Matters

### (a) Interim Payments Under Section 503(b)

■ PacifiCorp's entitlement to additional payments, under Bankruptcy Code section 503(b) for the incremental amounts it would charge, rests on the assumption that it is entitled to payment at a higher rate. Its request, in its supplemental brief,[33] that such amounts be escrowed, rests on a like assumption. The Utah PSC has not approved any higher rate, or the application of any alternative rate structure for charging MagCorp for the electricity MagCorp would receive, and the level at which the Utah PSC may later do either of these is unknown. As significantly or more so, this Court has determined that MagCorp is entitled to Interruptible Service—at least until, or unless, the Utah PSC grants PacifiCorp a waiver—and PacifiCorp's request for payment under section 503(b)—premised, as it is, on rates that have not been approved by the Utah PSC for MagCorp, and are not for Interruptible Service—is not only unsupported by the present state of the law and facts; it is contrary to it.

Additionally, PacifiCorp seeks payments to it, as to which it has not yet established an entitlement, as a kind of security device to protect its interests in the event that the Utah PSC concludes that (1) PacifiCorp is entitled to a higher rate, and (2) in an amount equal to or higher than the amount PacifiCorp wishes now to collect. PacifiCorp's assumption that it will ultimately be entitled to some increased rate after the Utah PSC has determined the issue is hardly frivolous, but the amount PacifiCorp seeks—even when based on a Utah PSC "recommendation"[34]—has not been determined by the Utah PSC on the merits of the rate to be paid. Under these circumstances, the Court must consider whether the Court should be awarding section 503(b) payments premised on a new, higher rate, before the new rate has been fixed, as a security device for PacifiCorp, *pendente lite* while PacifiCorp's rate litigation with MagCorp is ongoing.

The Court believes that it plainly should not, and once more this Court finds guidance from the *Megan–Racine* cases. In *Megan–Racine II,* NIMO and Megan–Racine were in the course of litigating the proper construction of N.Y. Public Service Law § 66–c(2)—the issue that was ultimately determined in *Megan–Racine III,* and later affirmed by the Second Circuit in *Megan–Racine III–Circuit.* Under that law, if Megan–Racine had been "grandfathered" (as the debtor Megan–Racine argued), the statute would set a floor of $.06 per kilowatt hour for electricity sold by Megan–Racine to NIMO, but if Megan–Racine had not been "grandfathered" (as NIMO argued), NIMO could buy its electricity from Megan–Racine at $.03, half the price. Instead of paying Megan–Racine

---

denced an effort to ascertain and comply with the applicable law; were technical and unintended violations of the Debtor's rights; did not evidence malevolent intent or bad faith on the part of the Landlord; and were not malicious or egregious).

**33.** PacifiCorp Supp. Br. at 11.

**34.** *See* PacifiCorp Supp. Br. at 12.

the full $.06 rate that NIMO was then paying (and taking the credit risk that any overpayment later determined to have been made could be repaid), NIMO sought an order under Bankruptcy Code 105(a) authorizing it to pay the difference into escrow.[35]

Judge Gerling denied that request. He noted that NIMO's motion had "the hallmarks of a prejudgment attachment motion," and that the request would have the effect "essentially to impound Debtor's income."[36]  If successful, it would give NIMO security in Megan–Racine assets—to "protect Niagara Mohawk and its ratepayers by ensuring that funds to which Niagara Mohawk is unquestionably entitled will be available for distribution, and not spent by the Debtor."[37]  Judge Gerling held that although NIMO's motion had the hallmarks of prejudgment attachment motion, NIMO had not even met the minimum requirement of properly pleading its request.[38]  And considering the merits of it, he stated:

> NIMO asks the Court to elevate its status in the creditor hierarchy past other general creditors, administrative claimants and secured creditors by authorizing what is essentially a post-petition preference.

*Id.* at 327.  Judge Gerling further noted that assuming, arguendo, that he had a statutory basis for considering the impact on NIMO's rate payers, he could not find that the burden on them (there, less that $1 per month, per rate-payer) would out-weigh the immediate harm that would result to the creditors, equity holders and debtor if the alleged overpayments were escrowed.

Conceptually, this case is no different. While NIMO, which was to pay the debtor Megan–Racine, contended that it was paying too much and wanted security for the alleged overpayments, here PacifiCorp, which is receiving payment from the debtor MagCorp, wants security for the alleged underpayments—in each case by depriving the debtor, pre-determination, of its property.  This Court is not of a mind to approve such an arrangement any more than Judge Gerling was.  PacifiCorp's escrow alternative suffers from the same deficiencies as the escrow requested in *Megan–Racine II*.  Accordingly, the Court concludes that PacifiCorp's requests for payment, as an administrative expense, or into escrow, of additional amounts that PacifiCorp contends to be due to it as a consequence of its having raised its rates before approval thereof by the Utah PSC is denied at this time, without prejudice to renewal after action by the Utah PSC.[39]

### (b) Increased Deposit Under Section 366

The analysis is much the same with respect to PacifiCorp's request for an increased deposit.  At this juncture, the factual and legal predicate for a change in the deposit is lacking.  While it may well be likely that, even with Interruptible Service, MagCorp's electrical rate will go up,

---

**35.** *See* 192 B.R. at 324.

**36.** *Id.,* at 325.

**37.** *Id.* A substantially identical argument has been made by PacifiCorp here.

**38.** *Id.*

**39.** The Court's decision is without prejudice to the rights of both parties to argue the propriety of any request for retroactive pay-

ment, and to argue that any decision as to retroactivity should be made by this Court and not the Utah PSC.

The Court does not understand that MagCorp has failed to pay PacifiCorp for any amounts that would be due under the old rates.  To the extent MagCorp has failed to do so, PacifiCorp's request for a section 503(b) payment is granted.

the extent to which it will do so, at this point, is uncertain. Requiring MagCorp to allocate valuable liquidity to provide further "adequate assurance" to satisfy obligations before their amount has been fixed would prejudice the entirety of MagCorp's unsecured creditor body for the benefit of a single one. As the Second Circuit held in *Virginia Elec. & Power Co. v. Caldor, Inc.—New York (In re Caldor),* 117 F.3d 646 (2d Cir.1997):

> In deciding what constitutes "adequate assurance" in a given case, a bankruptcy court must "focus upon the need of the utility for assurance, and to require that the debtor supply *no more than that,* since the debtor almost perforce has a conflicting need to conserve scarce financial resources."

117 F.3d at 650 (emphasis by Second Circuit) (citations omitted).

Accordingly, the Court concludes that PacifiCorp's request for an increase in its deposit, for adequate assurance of future payment by MagCorp, must be denied at this time, without prejudice to renewal after the Utah PSC has made any relevant determinations with respect to the foregoing.

### Conclusion

The Court holds that MagCorp is entitled to Interruptible Service under 18 C.F.R. § 292.305(b)(1), subject to change if the Utah PSC grants a waiver under 18 C.F.R. § 292.3059(b)(2). The Court will defer to the Utah PSC, however, with respect to the construction and implementation of the Utah PSC's earlier determinations, and the setting of rates.

PacifiCorp's requests for payment of an administrative expense and for an increase in its deposit are denied at this time, without prejudice to renewal after determinations by the Utah PSC.

SO ORDERED.