**In re CAFE PARTNERS/WASHINGTON 1983, A NEW YORK LIMITED PARTNERSHIP, Debtor.**

**Bankruptcy No. 87–00939.**

United States Bankruptcy Court, District of Columbia.

Jan. 14, 1988.

Paul M. Thomas, Stephen B. Huttler, Shaw, Pittman, Potts & Trowbridge, Brian R. Seeber, Gins & Seeber, Washington, D.C., for debtor.

Bradshaw Rost, Washington, D.C., Robert E. Greenberg, Deso, Greenberg & Thomas, Washington, D.C., for movant.

## MEMORANDUM AND ORDER

GEORGE F. BASON, Jr., Bankruptcy Judge.

Before the Court is a motion by the Debtor's Landlord [1] for relief from the automatic stay imposed by 11 U.S.C. Section 362(a), so that the Landlord may institute proceedings to collect claimed rental accruals and arrears and to evict the Debtor from its premises, and so that the Landlord may repossess personal property consisting of restaurant equipment that was located on the premises and on which the Landlord claims a security interest.[2] The premises are the Potomac Restaurant site at 3000 K St., N.W., Washington, D.C. The Potomac

was a "spectacle" or "showplace" restaurant located on the Georgetown bank of the Potomac River. The restaurant premises and the equipment constitute virtually the sole assets of the Debtor partnership. The Washington Harbour real estate development project constitutes essentially the sole asset of the Landlord, and the Potomac Restaurant was the development's "anchor" tenant.

A hearing began on November 24, 1987 and continued on December 2, 1987 concerning the Landlord's lift-stay motion. The evidence received at that hearing and the entire record of this case reveal the following:

In September 1983 the Landlord and the Debtor's predecessor entered into a 40-year lease for the premises with renewal options totaling 25 years. Both the Landlord and the Debtor have experienced serious financial difficulties, and they have been embroiled in controversy between themselves for a considerable time. In order to resolve various disputes, the lease was amended and modified three times—in February and August 1986 and in February 1987. In addition to the rent stipulated in the lease, as amended, the Debtor is obligated to the Landlord on a $1 million, 40-year loan and on a $648,000, five-year loan. The Landlord contends that the monthly amounts payable on these two obligations constitute "additional rent," and the Debtor disputes this characterization. It is not necessary for this Court to resolve this dispute at this time.

Up through August 1987 the Debtor was fully current in payment of all amounts billed by the Landlord for rent under the lease as amended in February 1987 and fully current on all amounts then due on

1. The motion was filed by "Herbert S. Miller, Managing General Partner of Washington Harbour Associates Limited Partnership,"

2. The Landlord lent some $350,000 to Warner Leroy ("Leroy") the sole shareholder and chief executive officer of Leroy Productions, Inc., which is the Debtor's sole general partner, so that Leroy could buy the restaurant equipment and lease it to the Debtor. Leroy's non-recourse, secured note to the Landlord was to be repaid at the rate of two-thirds of whatever amount Leroy received from the Debtor on the

equipment lease. However, the Debtor has never paid Leroy anything on the equipment lease.

Although the terms of this transaction are rather extraordinary, it is obvious, from review of the various agreements among the parties and the entire record of this case and from the Court's observation of witnesses and counsel, that the Landlord was and is itself sophisticated and moreover was and is represented by sophisticated counsel. The Landlord agreed to those terms with its eyes open. Hence, the Landlord cannot now complain that its present rights are fixed and limited by those terms.

the $1 million and the $648,000 loans. In September 1987 the Landlord retroactively recalculated the common area maintenance and real estate tax charges payable by the Debtor for a portion of 1986 and for all of 1987 up to the date of billing; the Landlord then sent the Debtor a demand letter for payment of these recalculated charges and other items. The Debtor's October 13, 1987 letter questioning these charges went essentially unanswered. On October 22, 1987 the Landlord sent the Debtor a five-day notice of default and lease termination, on account of the Debtor's failure to pay this newly-billed amount.[3] Four days later, on October 26, 1987, the Debtor ceased restaurant operations.

The fifth day, October 27, 1987, was a busy day. On the morning of that day (according to the testimony of Alan Garmise, the vice president of the Debtor's general partner), the Debtor, in order to prevent pilferage by former employees and other souvenir hunters, began to remove from the restaurant premises a number of small items; these items were taken to and are stored for safekeeping at the general partner's warehouse in New York, and an inventory of them has been taken. This Court, having observed Mr. Garmise, finds him to be a highly credible witness; the Court believes his testimony concerning the reason for removal of certain items; and the Court finds and concludes that the Debtor, faced with an emergency situation, was justified in taking the prudent and necessary steps that it did take in order to preserve those assets for the benefit of the estate and all its creditors, including the Landlord. These steps cannot in fairness or good conscience be characterized as constituting a default under the clause of the security agreement that prohibits removal of collateral from the premises such as to justify any adverse consequences to the Debtor; they do not fall within the intent or spirit of that clause. If the Tenant had removed the equipment solely in order to save it from imminent destruction by a fire

on the premises, surely no court would allow the Landlord to declare a default. The same result follows here. There being no other basis on which the Landlord claims any default as to the equipment, the lift-stay motion must be denied insofar as it seeks leave to repossess the equipment; if there is no default, there is no right to repossess.

Also on October 27, 1987 the Debtor and its general partner filed a lawsuit against the Landlord in D.C. Superior Court (C.A. No. 9179–87) alleging various causes of action based on the lease, including challenges to the increased rental demand made in September 1987.

Finally, in the afternoon of that same day two other legal proceedings of major significance were commenced. First, at 3:07 p.m. the Debtor filed its Chapter 11 bankruptcy petition in this Court. Then, at 4:46 p.m. the Landlord sought and obtained a temporary restraining order from the D.C. Superior Court (C.A. No. 9194–87) prohibiting the Debtor, the Debtor's general partner, and Mr. Leroy from further removing from the premises any items in which the Landlord holds a security interest. This temporary restraining order was sought and obtained notwithstanding notification by the Debtor's counsel that the bankruptcy petition had already been filed earlier that day and that hence the automatic stay imposed by 11 U.S.C. Section 362(a) was then in effect. Without violating the automatic stay the Landlord could have but did not seek the same relief in this Court as it sought and obtained in D.C. Superior Court in knowing violation of the automatic stay.

According to Mr. Garmise's unchallenged testimony, which this Court believes: Pursuant to and immediately after issuance of the temporary restraining order, the Landlord changed the locks on the restaurant premises and posted security guards at the premises. Ever since then, in order to gain access to the premises for the purpose of

---

3. The Landlord claims that "[b]y October 26, 1987, Debtor owed the Landlord $327,823.31 [or $335,103.29] for rent and additional rent under the lease." This figure apparently includes the difference in monthly rent for September and October 1987 at the newly-billed rate as compared to the previously-billed rate, as well as other items.

showing the premises to prospective purchasers of the restaurant business or for any other purpose, the Debtor must first make a request through the Debtor's counsel to the Landlord's counsel, naming all those persons that the Debtor desires to have access; when those persons arrive at the premises, they must be accompanied by the security guards.

■ The Landlord adduced considerable testimony and other evidence at the hearing concerning the financial harm that has flowed and will flow to it and to its other tenants as a result of the Debtor's ceasing operations on October 26, 1987. However, it is indisputable that the Landlord itself sought to terminate the Debtor's lease as of just one day later, on October 27, 1987. Had the Debtor heeded to the Landlord's demand, the Debtor's operations would have ceased on October 27, 1987. The one-day difference between what the Debtor in fact did and what the Landlord demanded that the Debtor do is *de minimis*. Nor is it disputed that the Landlord's five-day notice of lease termination is what precipitated both the Debtor's ceasing operations and the Debtor's bankruptcy filing. In view of what this Court finds to be precipitous and unreasonable demands by the Landlord for immediate payment of large, previously unrequested and undisclosed amounts, which were obviously beyond the Debtor's capability to pay on such short notice, this Court concludes that any harm to the Landlord as a result of the Debtor's ceasing operations and filing for bankruptcy amounted to a self-inflicted wound. The Landlord should not and will not be permitted to complain about what it itself demanded and precipitated. Thus, the Landlord's claim that the Debtor is in default under the lease because the Debtor has ceased restaurant operations is rejected.

The Landlord also adduced testimony that when a tenant files for bankruptcy it becomes extremely difficult for the landlord to re-lease the space occupied (or previously occupied) by the tenant, because the landlord does not have legal possession of the premises and cannot quote terms and also because potential tenants are nervous about possible legal entanglements. However, those are inevitable consequences of the bankruptcy law. Section 365 of the Bankruptcy Code prohibits a landlord from gaining "legal possession" of leased premises during the period that the bankrupt tenant (or trustee) has the option of either "assuming" or "rejecting" the lease. That period normally lasts for at least 60 days, and it may last much longer. During that period the *tenant,* not the landlord, has the right to "quote terms". Indeed, the tenant has the right to assume and then to assign the lease to a new lessee notwithstanding any anti-assignment clause. The bankrupt tenant thus can gain the advantage, for the benefit of the tenant's other creditors, of any "equity" that may exist in the leasehold estate—i.e., any difference between the rent agreed to by the landlord at the inception of the lease (as amended up to the date of bankruptcy) and the current fair rental value of the premises. If there is such an equity, bankruptcy law prevents the landlord from enforcing a forfeiture and holds the landlord to the bargain it had struck with the tenant.

This Court found extremely disquieting the testimony by the Landlord's witness Wayne Carroll[4] that the Landlord had received some twenty inquiries about the premises since the bankruptcy but had not met with *any* of the inquirers because, to paraphrase, "we were advised by counsel that until a resolution is reached [before the Court] we should not enter into any negotiations for that space"; and: "I told inquirers I could not talk now but possibly could when the situation was resolved by the Court." Equally disquieting was the testimony by another vice president of the Landlord's leasing agent, Courtney Lord, that one of the twenty inquirers had been referred to him by the Debtor, that a meeting was arranged with that potential lessee, but then the meeting was cancelled.

**4.** A vice president of Western Development Corp., the Landlord's management and leasing agent.

The inference is strong, and this Court so finds as a fact, that this refusal by the Landlord, on the advice of counsel, to talk to or meet with any prospective new lessees during the period of the Debtor's right to assume and assign the lease, was deliberately designed by the Landlord and its counsel to interfere with the Debtor's efforts to reorganize by inhibiting the Debtor from effectively exercising its bankruptcy-law right to assume and assign the leasehold estate, thus depriving this Debtor's other creditors of the benefit of any equity in the leasehold estate and gaining a windfall for the sole benefit of the Landlord.

There have recently come to this Court's attention both caselaw and scholarly authority for the proposition that "the concept of adequate protection was designed to protect secured creditors and not the non-debtor party to an executory contract or unexpired lease" and that "the exclusive remedies for the non-debtor party [to an unexpired lease] were found in Section 365 of the Code."[5] Olack, *Executory Contracts and Unexpired Leases: Right to Adequate Protection Prior to Assumption or Rejection,* 4 Bankr.Dev.J. 421, 422 (1987) (Footnotes omitted).

The concept of "adequate protection" is found in Section 361 of the Code, which provides:

> When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by —(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property; (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or (3) granting such other relief, other than entitling such entity to compensa-

tion allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

*In re Sweetwater,* 40 B.R. 733 (Bankr. Utah 1984), involved an equipment lease on rapidly depreciating property. The Court exhaustively combed the entire background of the 1978 Bankruptcy Code, including leading Bankruptcy–Act cases, and the entire legislative history of the Code, pointing out in particular that "nowhere in the legislative history have lessors been mentioned as being entitled to adequate protection." 40 B.R. at 742.

The *Sweetwater* court then concluded (40 B.R. at 745):

> Congress, in enacting the Bankruptcy Code, recognized the competing interests of creditors. The origin of the adequate protection concept shows that it was intended to protect the constitutional rights of secured creditors in their collateral under the fifth amendment's taking and due process clauses, and to enable them to receive the benefit of their bargain.
>
> Congress recognized that the rights of lessors are fundamentally different from those of secured creditors. Congress has effectively dealt with the rights and remedies of lessors under Section 365 of the Code. The decision to seek an early determination of whether to assume or reject an unexpired lease rests with the lessor. If the debtor elects to assume, the lessor, unlike any other creditor, is entitled to have its entire prepetition debt cured, as well as adequate assurance of future performance under the terms of the lease. If the lease is ultimately rejected, the estate is liable for the reasonable value of the leased property during the "breathing spell" after the filing and before rejection.
>
> The authoritative statement of Congressional intent is the joint explanatory statement of the floor managers. That statement indicates that Congress intended to provide adequate protection to se-

---

**5.** The leading case is *In re Sweetwater,* 40 B.R. 733 (Bankr. Utah 1984).

**180**

cured creditors only, not lessors. This conclusion is strengthened by a review of the entire legislative history and a comparison of the provisions of Sections 361, 363(e) and 365(b). To permit lessors adequate protection would defeat the purpose of those sections.

Accordingly, the Court holds that the debtor need not provide adequate protection to First Security.

Mr. Olack's law journal article[6] points out that the Supreme Court's decision in *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984) lends further support to the *Sweetwater* analysis: "[A]fter *Bildisco*, the law appears to provide that the non-debtor party to an executory contract or unexpired lease cannot require the debtor-in-possession to adhere to the terms of the contract or lease, prior to assumption by the debtor-in-possession."[7] 4 Bankr.Dev.J. 421, 424.

Mr. Olack also observes that, whereas Section 361(3) expressly *excludes* the provision of an administrative-expense priority as a means of providing "adequate protection," Section 503(b)(1) *requires* the provision of administrative-expense priority (to the extent of the reasonable value of use and occupancy) in the case of executory contracts or unexpired leases that are rejected. He concludes that "[t]his inconsistency ... could not have been intended by Congress." 4 Bankr.Dev.J. at 436.

Finally, it seems significant to this Court, as it did to the court in *In re Wheeling-Pittsburgh Steel Corp.*, 54 B.R. 385, 391, n. 5 (Bankr.W.D.Pa.1985), that Section 361, in its list of sections under which adequate protection may be 362, 363, or 364 of this title ...") does not include Section 365 at all.

■ This Court is persuaded by the authorities whose reasoning and analyses are briefly synopsized above. This Court concludes that, as a matter of law under Section 365, a non-debtor landlord is not entitled to interim "adequate protection." Nor, as a corollary to that principle, is a non-debtor landlord entitled to relief from the automatic stay imposed by Section 362(a) in the absence of "adequate protection." Rather, the exclusive remedies for the landlord are found in Section 365.

Section 365(d)(3), added by the 1984 amendments to the Bankruptcy Code, sets forth a special rule applicable solely to "unexpired lease[s] of nonresidential real property," such as the lease at issue here. Section 365(d)(3) requires "timely perform[ance] of all the obligations of the debtor"[8] during the interim period "until such lease is assumed or rejected." And: "The Court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief [*i.e.*, the date the voluntary petition was filed], but the time for performance shall not be extended beyond such 60–day period." Section 365(d)(3) of the Code.

In the instant case, the Landlord contends that section 365(d)(3) requires this Debtor to have paid, by Monday, December 28, 1987, the full rent (including what the Debtor asserts are loan payments and not rent) at the increased level first demanded by the Landlord in September 1987, for the period of the first 60 days after the Debtor filed its voluntary petition—that is, from October 27 through Saturday, December 26, 1987. Failure to have done so, the argument proceeds, works an automatic rejection of the lease pursuant to section 365(d)(4).

This Court agrees with the Ninth Circuit Court of Appeals that this "interpretation is a draconian one," that "[n]othing in either subsection, in any other part of the Bankruptcy Code, or in the legislative history of that Code suggests [such] a read-

**6.** Olack, *Executory Contracts and Unexpired Leases: Right to Adequate Protection Prior to Assumption or Rejection,* 4 Bankr.Dev.J. 421 (1987).

**7.** Mr. Olack also points out that "[i]t is significant to note that the Bildisco Court discussed executory contracts in general terms and, therefore, the case should not be limited to resolving conflicts between federal bankruptcy and labor laws." 4 Bankr.Dev.J. at 424.

**8.** With an immaterial exception.

ing," and that "Congress intended the bankruptcy courts to have the discretion to consider all of the particular facts and circumstances in each bankruptcy case and to decide whether the consequence of a violation of subsection (d)(3) should be forfeiture of the unassumed lease, some other penalty, or no penalty at all." *In re Southwest Aircraft Services, Inc.*, 831 F.2d 848, 854 (1987).

■ The "particular facts and circumstances" that are pertinent in this case are: This Court has already found precipitous and unreasonable the demands by the Landlord for immediate payment of large, previously unrequested and undisclosed amounts, the rationale for which the Landlord has never even attempted to explain. Moreover, this Court has had the question of what would be an appropriate level of payment, if any, under advisement from December 3, 1987 until now, so that the Debtor has had no way of knowing how much, if anything, it might be obligated to pay. Finally, the question of the proper level of rent under the lease is also the subject of a separate lawsuit by the Debtor against the Landlord, now pending in D.C. Superior Court. In view of all these circumstances, plus the additional matters discussed below, this Court holds that the Debtor need not pay anything on account of its obligations under the lease for the initial 60–day period of this case, until final resolution of the proper level of rent in the pending lawsuit in D.C. Superior Court.

■ Even then, for three reasons, no payment at all should be required for the period—however long it lasts—that the Landlord either continues to deprive the Debtor of use and occupancy of the premises or continues to refuse to meet, discuss terms, or negotiate with prospective purchasers of the Debtor's leasehold interest.

The first reason for requiring no payment arises under federal bankruptcy law. It is undisputed and indisputable that the Landlord acted in knowing, intentional, willful violation of the automatic stay imposed by 11 U.S.C. Section 362(a) when it proceeded to obtain a temporary restraining order from D.C. Superior Court and then, pursuant to that order, to change the locks, post security guards, and prevent almost all access to the premises by the Debtor. The Landlord's expressed concerns about removal of equipment could easily have been resolved by far less draconian measures.[9]

The automatic stay is one of the most fundamental protections afforded to a bankrupt entity. The legislative history emphasizes this point:

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.[10]

In addition:

> The automatic stay also provides creditor protection. Without it, certain creditors would be able to pressure their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally. A race of diligence by creditors for the debtor's assets prevents that.[11]

Professor Frank R. Kennedy, a leading scholar on bankruptcy law, points out that, when Congress first enacted automatic

---

9. For example, a requirement that only designated and inventoried items be removed for safekeeping to a place to to which the Landlord had access.

10. S.Rep. No. 989, 95th Cong. 54–55, *reprinted in* 1978 U.S. Code Cong. & Admin. News 1978, 5787, 5840–41.

11. S.Rep. No. 989, 95th Cong., 49, *reprinted in* 1978 U.S. Code Cong. & Admin. News 1978, 5835.

stays in the Chandler Act in 1938, "Congress thus recognized that continuation of the debtor's enterprise during the pendency of the reorganization case was crucial to any realistic hope for rehabilitation." Kennedy, *Automatic Stays Under the New Bankruptcy Law,* 12 U.Mich.J.L.Ref. 1, 4 (1978).

The courts have uniformly recognized and given effect to the importance of the automatic stay. *See, e.g., In re Tringali,* 796 F.2d 553, 562 (1st Cir.1986) (citing and quoting extensively from legislative history and caselaw); *A.H. Robins Co. v. Piccinin,* 788 F.2d 994, 998 (4th Cir.1986) ("The purpose of this section [362] by its various subsections is to protect the debtor from an uncontrollable scramble for its assets in a number of uncoordinated proceedings in different courts, to preclude one creditor from pursuing a remedy to the disadvantage of other creditors, and to provide the debtor and its executives with a reasonable respite from protracted litigation, during which they may have an opportunity to formulate a plan of reorganization for the debtor"); *Fidelity Mortgage Investors v. Camelia Builders, Inc.,* 550 F.2d 47, 55 (2d Cir.1976), *cert. den.,* 429 U.S. 1093, 97 S.Ct. 1107, 51 L.Ed.2d 540 (1977) ("The stay insures that the debtor's affairs will be centralized, initially, in a single forum in order to prevent conflicting judgments from different courts and in order to harmonize all of the creditors' interests with one another.")

Congress in its 1984 amendments to the 1978 Bankruptcy Code underscored the importance of the automatic stay by adding subsection (h) to Section 362. Subsection (h) provides for recovery not only of actual damages but also "attorneys' fees, and, in appropriate circumstances ... punitive damages" for "any willful violation" of the automatic stay. *See Budget Service Co. v. Better Homes of Virginia, Inc.* 804 F.2d 289, 293 (4th Cir.1986) (where secured creditor "knew ·of the pending [Chapter 11 bankruptcy] petition and intentionally attempted to repossess the [collateral] vehicles in spite of it," the "bankruptcy court acted within its power in awarding compensatory damages, attorneys' fees and punitive damages to" the debtor corporation under Section 362(h)).

In sum, violation of the automatic stay strikes at the heart of the Bankruptcy Code's mechanisms for debtor rehabilitation and for equity amongst creditors; willful violation is an extremely serious matter to be dealt with severely.

Furthermore, "[s]ince the purpose of the stay is to protect creditors as well as the debtor, the debtor may not waive the automatic stay." *Commerzanstalt v. Telewide Systems, Inc.,* 790 F.2d 206, 207 (2d Cir. 1986). Therefore any non-resistance or acquiescence by the Debtor in this case to the actions taken by the Landlord is immaterial.

This Court finds and concludes that the Landlord's acts of obtaining a temporary restraining order, changing locks, and excluding access to the premises constituted a willful, flagrant violation of the automatic stay, and that such violation precludes the Landlord from having a valid claim for rent during the period of exclusion.

 The second reason why no payment should be required also arises under federal bankruptcy law. It is well settled that, as held in *In re Lockwood Enterprises, Inc.,* 70 B.R. 306, 307 (Bankr. S.D.N.Y. 1987), "[u]nless and until a trustee [or debtor] expressly assumes a lease, the trustee [or debtor] is liable only for the 'reasonable value of use and occupancy of the premises.' 2 Collier on Bankruptcy s. 365–32 (15th ed. 1986) (citing *Philadelphia Co. v. Dipple,* 312 U.S. 168, 61 S.Ct. 538, 85 L.Ed. 651 (1941)." [12] Ordinarily, of course, there is a presumption that the contractually reserved rent is reasonable. However, in the instant case, not only is the correct amount of the "contractually reserved rent" in dispute and the subject of a pending lawsuit, even more important is that the Landlord has excluded the Debtor from virtually all

**12.** There is no reason to believe that the 1984 amendments were intended to or did change this long-settled rule.

use and occupancy of the premises. It would be a contradiction in terms to require the Debtor to *pay for* use and occupancy while the Debtor is being *denied* use and occupancy.[13]

Finally, the third reason why the Landlord is not entitled to any payment of post-petition "administrative rent" (or "use and occupancy" payments) arises under the local law of the District of Columbia. Under that law, "when suit is brought for rent due, or for possession for non-payment of rent, [a tenant whom the Landlord has wrongfully deprived of possession] ... may defend on the ground that he does not owe ... the rent claimed." *Lalekos v. Manset,* 47 A.2d 617, 620 (Mun.App.D.C. 1946).[14] *See also Peoples Mortgage Corp. v. Bedrosian,* 154 F.2d 332, 333 (D.C.Cir. 1946), holding that "a lessee who is completely deprived, by the fault of the lessor, of enjoying any part of the term to which his lease entitled him" may recover as damages against the landlord "the difference between the fair market value of the lease and the rental reserved therein, plus any sums paid by the lessee to the lessor." (Footnote omitted.)

For all the foregoing reasons it is

ORDERED that the Landlord's motion for relief from the automatic stay imposed by 11 U.S.C. Section 362(a) is denied in its entirety.

---

**13.** It is immaterial that the Debtor voluntarily shut down its restaurant operation one day before the unlawful lockout. Not only does the lockout prevent the Debtor from reopening, the Landlord's refusal to meet or discuss terms or negotiate with prospective new tenants, and the onerous conditions the Landlord has imposed on the Debtor's even showing the premises to prospective new tenants, have so seriously interfered with the Debtor's rights to use and occupy the premises and to assume and assign the lease that the Landlord has thereby forfeited any right to "use and occupancy" payments.

Nor does the use of the property for storage of equipment constitute a sufficient use *by the Debtor* to justify any payment. The Debtor sought to remove the property to its general partners' storage warehouse for safekeeping, where presumably it could be stored at nominal or no cost to the Debtor, and the Debtor was prevented from doing so by the Landlord. Having wrongfully prevented the property's removal, the Landlord cannot now claim rent for its storage.

**14.** In *Lalekos* the landlord gave possession of only a portion of the premises to the tenant, and the tenant was permitted to "defend on the ground that he does not owe *all* the rent claimed." (Emphasis added.) Here, where the landlord has deprived the tenant of possession of the *entire* premises, it follows that the tenant can defend on the ground that he does not owe *any* of the rent claimed.