**In re Dawn STEMBRIDGE, Debtor.**

**No. 01–46032–DML–13.**

United States Bankruptcy Court,
N.D. Texas,
Fort Worth Division.

Dec. 9, 2002.

Behrooz P. Vida, Venable & Vida, Bedford, TX, for Debtor.

J. Ward Holliday, Veronica Pillay, Rudri Bhatt–Patel, J. Ward Holliday & Assoc., P.C., Dallas, TX, for Plaintiff.

### *REVISED MEMORANDUM OPINION AND ORDER*

DENNIS MICHAEL LYNN, Bankruptcy Judge.

Before the court is the Objection to Confirmation (the "Objection") filed by Chase Manhattan Bank, USA, N.A. ("Chase") with respect to the Final Chapter 13 Plan and Motion for Valuation (the "Plan") dated May 19, 2002, filed by Dawn Stembridge ("Debtor" or "Stembridge") in her chapter 13 case. The court heard evidence and argument in connection with the Objection [1] on August 22, 2002. At the invitation of the court, Chase and Debtor thereafter filed briefs in support of their respective positions. On November 18, 2002, the court, having issued its decision

---

1. Only Chase opposed confirmation of the Plan. The Plan otherwise meets the requirements of section 1325(a) of the Bankruptcy Code, and confirmation is subject only to res- olution of the Objection. Hereinafter, references to a section shall refer to the applicable section of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, unless otherwise indicated.

in *In re Gray*,[2] and having concluded that questions presented by this case are of importance, sent a letter to counsel for Chase and Debtor reopening the confirmation hearing and requesting that the parties provide additional evidence as well as further argument on certain specific issues at a hearing on November 22, 2002.[3] At that hearing the parties stipulated to additional evidence and argued to the court.

This matter is a core proceeding over which this court exercises jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(b)(2)(L). This Memorandum Opinion and Order embodies the court's findings of fact and conclusions of law.[4]

## I. *Background*

On August 13, 1999, Stembridge entered into a retail installment contract (the "Contract") with King Charlie Hillard Ford for the purchase of a 1999 Ford F–150 truck (the "Truck") for $25,966.39. Together with a license fee, a title charge, an inspection fee and finance charges, the Contract provided that Stembridge pay a total of $33,244.03, $1,000.00 down and the balance in monthly payments of $414.69 beginning September 12, 1999. Chase underwrote the financing of the Truck and subsequently became the owner and holder of the Contract. The Contract is secured by a properly perfected lien on the Truck.

Approximately two years later, on August 22, 2001, Stembridge filed her chapter 13 petition commencing this case. At that time the remaining debt owed Chase pursuant to the Contract was $22,946.57. On September 10, 2001, Debtor filed her preliminary plan in which she valued the Truck at $9,540.00.[5] On the same day, pursuant to ¶ 4a of General Order 98–4 [6] of the Bankruptcy Court for the Northern District of Texas ("General Order 98–4"), Debtor filed an Authorization for Pre–Confirmation Disbursement (the "APD"), by which Debtor proposed to pay Chase $119.25 per month as adequate protection.[7] A copy of the APD was served by mail on Chase on September 17, 2001.

On October 29, 2001, Chase filed the Objection, asserting that the value of the Truck was substantially greater than $9,540.00. Between the filing of the APD and the present, Debtor has paid, and Chase has received, a total of $1,311.75 in adequate protection payments.

## II. *Issues*

The court is now presented with two issues:

1. Considering the adequate protection paid by Debtor, the collateral value as to which Chase was entitled to adequate protection and the replace-

---

2. http://www.txnb.uscourts.gov/opinions/dml/401–47400–Gray.pdf (publication pending).

3. The court is most appreciative of the time and effort counsel have expended in this matter. Their willingness to spend time, which will largely go uncompensated, and the high quality of their performance is a tribute to their dedication to the legal profession.

4. *See* Fed. R. Bankr.P. 7052, 3015(f) and 9014.

5. This is the same value stated by Debtor for the Truck in the Plan before the court. *See* General Order 98–4, ¶ 4f.

6. Paragraph 4a states in pertinent part: "Within 15 days of the Petition Date, the Debtor shall file and serve on the Trustee and all scheduled creditors an Authorization for Pre–Confirmation Disbursement...." A debtor may elect to authorize no such disbursements. Changes in Pre–Confirmation Disbursements must be noticed to adversely affected creditors.

7. Under guidelines promulgated by the chapter 13 standing trustee, monthly adequate protection payments for an undersecured creditor are calculated at 1.25% of collateral value.

ment cost of the Truck, what treatment under the Plan must Chase receive to satisfy the confirmation requirement of section 1325(a)(5)(B)?

2. What claim, if any, may Chase assert against Debtor pursuant to sections 507 and 503(b)?

## III. *Discussion*

### A. *Required Payment Pursuant to Section 1325(a)(5)(B).*

The problem posed by the first issue is that the court is required to reconcile two values for the Truck which are determined for different purposes as of different times. The Bankruptcy Code in section 506(a) provides that an undersecured creditor's claim will be divided into a secured claim and an unsecured claim based on "the value of such creditor's interest" in the estate's interest in the property securing the claim. The last sentence of section 506(a) requires that the "value ... be determined in light of the purpose of the valuation and of the proposed disposition or use of the property...."

This language clearly contemplates that a lender's collateral may be assigned a different value depending on when and why the valuation is performed. In fact, case law, including controlling precedent, instructs that a different value be used in determining a creditor's entitlement to adequate protection than should be used in establishing what a creditor must receive to satisfy section 1325(a)(5)(B).[8]

■ With regard to the provision of adequate protection, the secured creditor is entitled to have its interest protected against diminution by reason of the estate's ongoing possession and use of the creditor's collateral.[9] The interest of the secured creditor is properly valued from the secured creditor's perspective. In other words, the secured creditor must be protected such that the total value realizable from its collateral through foreclosure does not decrease as a result of the delay imposed by the bankruptcy case on enforcement of its rights.[10]

■ On the other hand, the amount the debtor must pay to the creditor to satisfy section 1325(a)(5)(B) is to be calculated

8. Section 1325(a)(5)(B) is the "cramdown" provision of chapter 13 of the Bankruptcy Code. If an undersecured creditor does not accept the debtor's plan and the debtor wishes to keep the creditor's collateral, the plan must provide that the creditor retain its lien on the collateral and receive "value, as of the effective date of the plan [that] is not less than the amount of such [creditor's allowed secured claim]."

9. *United Sav. Assn. Of Tex. v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 370–71, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988); *In re Hollins*, 185 B.R. 523, 528 n. 7 (Bankr.N.D.Tex.1995).

10. *See e.g. In re Winthrop Old Farm Nurseries*, 50 F.3d 72, 73–74 (1st Cir.1995); *In re Montgomery Court Apartments, Ltd.*, 141 B.R. 324, 340 (Bankr.S.D.Ohio 1992); *In re Sherwood Square Assoc.*, 87 B.R. 388, 393 (Bankr.D.Md.1988). Though a debtor contin-

ues to *use* the lender's collateral during the case and prior to the plan, adequate protection is provided (e.g., pursuant to section 362(d)) in lieu of enforcement of the Lender's remedies. During the case, the lender is also protected against loss of realizable value by section 507(b) and the opportunity to readdress the question of adequate protection. In determining the value to be protected, the bankruptcy court therefore not only considers adequate protection as an alternative to "disposition" of the collateral through exercise of the lender's remedies but also in a context in which the lender has protections and options not available post-confirmation. *See Associates Commer. Corp. v. Rash*, 90 F.3d 1036, 1064–65 (5th Cir.1996) (Smith, J., dissenting), *rev'g en banc*, 31 F.3d 325 (5th Cir.1994), *rev'd*, 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997).

from the debtor's perspective. As the Supreme Court held in *Associates Commercial Corp. v. Rash*, for purposes of section 1325(a)(5)(B), the value of the secured creditor's collateral is equal to the replacement cost the debtor would incur in acquiring like property.[11] At any given point in time, this value obviously will be greater than the value a secured creditor would receive upon realizing on its collateral. Replacement value of collateral such as the Truck, however, falls steadily over time. Since the value to be adequately protected may be determined as of an early date in a case and replacement value is fixed as of the effective date of the plan,[12] the latter may be less than the amount for which the debtor was obligated to provide protection.

In *Gray*, this court recently ruled that, respecting a vehicle like the Truck, replacement value should be calculated starting from the retail value provided in the N.A.D.A. Official Used Car Guide (the "NADA Value").[13] In the absence of specific evidence of the value of benefits not

received by a debtor but included in the NADA Value,[14] the NADA Value may be averaged with the contemporaneous Kelley Blue Book Private Party Value (the "KBB Value")[15] to produce a replacement value (the "Replacement Value").

Neither the NADA Value nor the KBB Value, however, accurately reflects what a secured creditor would likely realize from a pledged vehicle upon foreclosure of its lien.[16] Moreover, as noted above, the time when a court determines a lender's realizable value for adequate protection purposes will not be the same time as when Replacement Value must be calculated to determine whether section 1325(a)(5)(B) is satisfied.

■ Though it may be an imperfect measure of the value a secured creditor could expect to realize from a vehicle upon foreclosure, in the absence of better evidence, the court concludes that the N.A.D.A. Official Used Car Guide Trade Value[17] (the "Trade Value") approximates

---

**11.** 520 U.S. 953, 965, 117 S.Ct. 1879, 1886, 138 L.Ed.2d 148 (1997).

**12.** *Rash*, 520 U.S. at 961–62, 117 S.Ct. 1879; *In re Davis*, 215 B.R. 824, 825–26 (Bankr. N.D.Tex.1997). Since the effective date is the date on which the Truck would be "replaced," it represents the appropriate moment as of which to determine replacement value.

**13.** The NADA Value approximates the amount a dealer would charge a retail customer for a vehicle. The court hastens to note that, while the NADA and Kelly Blue Book values are utilized herein and in *Gray* for convenience, these sources are not dispositive on valuations. Valuation in future cases remains subject to specific evidence introduced by the parties as an alternative to the court's shorthand method.

**14.** *See Rash*, 520 U.S. at 965, n. 6, 117 S.Ct. 1879 (noting that replacement value should not include portions of the retail price (if any) that reflect the value of items not received by

the debtor—such as warranties, inventory storage and reconditioning).

**15.** The KBB Value is the price one would likely pay to purchase the vehicle from a private party as opposed to a dealer. Like the NADA Value, KBB Value was considered in *Gray* as a potential measure of replacement value.

**16.** Replacement value was viewed by the Supreme Court as being the amount that would change hands between a willing buyer and a willing seller. *See Rash*, 520 U.S. at 960, 117 S.Ct. 1879. A foreclosure sale, on the other hand, is a forced sale situation that will typically produce a lower price. *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537–38, 114 S.Ct. 1757, 1761, 128 L.Ed.2d 556 (1994). Foreclosure may also involve costs to the seller that would not reduce the value produced in an ordinary arms length transaction.

**17.** The court understands Trade Value as given in the N.A.D.A. Official Used Car Guide to

what a lender might recover from a vehicle through foreclosure.[18] Like Replacement Value, Trade Value will vary with time. The Trade Value for the point in time the lender is first entitled to adequate protection is hereafter referred to as the "Adequate Protection Value."

■ The situation is complicated by the payment of adequate protection. The undersecured creditor is not entitled to receive more than the value of its collateral. It may not be compensated for lost opportunity costs nor may it be paid interest on the secured portion of its claim.[19] In arriving at the amount Debtor is required to pay Chase to satisfy section 1325(a)(5)(B), the court must account for sums already received by Chase.

■ Thus, the court is required to consider Debtor's payments to Chase during the case and both the Adequate Protection Value and the Replacement Value of the Truck in deciding what Debtor must provide to Chase in the Plan to satisfy section 1325(a)(5)(B). In performing its analysis, the court is guided by two principles. First, an undersecured creditor may not receive a total return that is less than the value of its collateral as it was determined for adequate protection purposes. Second, neither should the lender receive more, including adequate protection payments, than it would have either (1) received pursuant to section 1325(a)(5)(B) on the effective date of the plan absent any adequate protection payments; or (2) recovered through foreclosure at the time it became entitled to adequate protection, whichever is greater.

■ The formula that effects these principles may be stated as follows: in order for a plan to comply with section 1325(a)(5)(B), an undersecured creditor must receive money or property having a value as of the effective date of the plan that, when added to any adequate protection payments received by the creditor, equals the greater of the Adequate Protection Value or the Replacement Value. Applying this formula to the case at bar, the respective values will depend on the dates as of which the Adequate Protection Value, the NADA Value and the KBB Value should be established.

■ The NADA Value and the KBB Value are to be determined as of the effective date of the Plan.[20] Since the date of the reopened confirmation hearing approximates the effective date of the Plan, the court will use a KBB Value and a NADA Value as of November 2002. These values are, respectively, $11,740 and $13,475.

be roughly the same as wholesale value. The alternatives—Debtor's proposed value of $9,540 and Chase's suggestion of NADA Value—are unrealistic. The latter not only is inconsistent with the court's holding regarding Replacement Value but also fails to give effect to the purpose of the valuation: protection of the creditor rather than value to the buyer. The former is simply not reflective of actual value.

18. Trade Value is likely to be at the high end of what a lender would recover from a vehicle, but, as suggested by the court in *In re Winthrop Old Farm Nurseries*, 50 F.3d 72, 74 (1st Cir.1995), a higher than forced-sale value

may be appropriate for adequate protection purposes because continued use of the collateral is contemplated.

19. *See Timbers*, 484 U.S. at 372–73 & 382, 108 S.Ct. 626. *See also* Section 502(b)(2).

20. Section 1325(a)(5)(B); *Rash*, 520 U.S. at 962, 117 S.Ct. 1879. "Effective date" is not defined in the Bankruptcy Code, and the Plan does not establish an effective date. Under section 1327, however, property revests in a debtor, subject only to the claims specified in the plan, and parties are bound upon confirmation, unless otherwise provided in the plan or the confirmation order.

These amounts in turn yield a Replacement Value of $12,607.50.

■ In the context of their dispute over the applicability of section 507(b) of the Bankruptcy Code, the parties have taken different positions regarding the point in time for which the Adequate Protection Value should be determined.[21] Chase points to section 507(b), which affords a creditor a super priority cost claim to the extent adequate protection provided "under section 362, 363, or 364 of [Title 11]" proves inadequate. Chase argues that this section, together with General Order 98–4, requires that adequate protection be provided from the date a debtor's original petition is filed. Chase, in effect, urges the court to find in General Order 98–4 a *requirement* that a debtor pay adequate protection from the petition date.

■ Debtor, on the other hand, contends that General Order 98–4 is nothing more than a framework to encourage settlement. As support, Debtor points to ¶ 4e of General Order 98–4, which states that "pre-confirmation disbursements on a se-cured claim shall be deemed *proposed* adequate protection payments." (emphasis added). Thus, according to Debtor, since Chase never requested adequate protection,[22] it was never in fact entitled to payments. By extension, this would make the date for fixing Adequate Protection Value the same as that for determining Replacement Value.

The court agrees with Debtor that General Order 98–4 does not establish requirements for payment of secured claims but rather provides a convenient mechanism that allows debtors, creditors and the standing chapter 13 trustee to conduct cases with minimal resort to the court. This interpretation is consistent with ¶ 4g of General Order 98–4, which allows for value disputes. Nevertheless, the court believes, and holds, that adequate protection is "provided" within the meaning of section 507(b) when a debtor authorizes preconfirmation disbursements under ¶ 4a of General Order 98–4. The court further holds that this is the time as of which the Adequate Protection Value should be de-

21. Hon. Steven A. Felsenthal, in *In re Davis*, 215 B.R. 824, 826 (Bankr.N.D.Tex.1997) used the petition date as the date for determining adequate protection. However, *Davis* did not squarely present the question of what date was proper, and the date for determining adequate protection was not significant to Judge Felsenthal's decision since (unlike the case at bar) the total of adequate protection payments exceeded the drop in the value of the secured creditor's collateral.

22. Numerous cases hold action is necessary to trigger the requirement of adequate protection in the context of section 507(b). *See e.g. In re Greenwald*, 205 B.R. 277, 278 (Bankr.D.Colo.1997); *In re Five Star Partners, L.P.*, 193 B.R. 603, 610 (Bankr.N.D.Ga.1996); *In re Cason*, 190 B.R. 917, 923 (Bankr.N.D.Ala.1995); *In re James B. Downing & Co.*, 94 B.R. 515, 520–21 (Bankr.N.D.Ill.1988); *In re Advisory Info. and Management Sys., Inc.*, 50 B.R. 627, 630 (Bankr.M.D.Tenn.1985). The court agrees action is necessary but concludes it may be undertaken other than by the affected creditor. Not only does a debtor act to establish adequate protection under General Order 98–4, but other parties (e.g., a debtor's co-owner) might ask in certain contexts that an undersecured creditor be adequately protected. Section 363(e), for example, which is the logical basis for Debtor's ADP, only requires that adequate protection be requested by an entity that has an interest in the property in question.

If action by Chase were required, filing of the Objection would suffice. Given the amounts involved, undersecured creditors cannot be expected to repeatedly appear in court to protect their rights if General Order 98–4 is to serve its purpose. Whether October 29, 2001, the date of the filing the Objection, should be the date for determining Adequate Protection Value or the court should look to the filing of the APD is another question. As discussed above, the court takes the latter view.

termined, since any claim allowable under section 507(b) would be measured based upon the Adequate Protection Value. In the instant case, the APD was filed on September 10, 2001. That is the date as of which the Adequate Protection Value of the Truck is fixed. As of September 2001, Trade Value for the Truck was $12,825.00.[23]

Based on the formula articulated above, Chase is entitled to consideration totaling the greater of Replacement Value or Adequate Protection Value. As Adequate Protection Value is the greater in this case (due to intervening depreciation of the Truck), the present value Chase must be paid to satisfy section 1325(a)(5)(B) is the Adequate Protection Value less adequate protection payments it has received during the case ($1,311.75), or $11,513.25.

## B. *Priority Claim for Failure of Adequate Protection*

Whether Chase is entitled to a priority claim by reason of a failure by Debtor to

provide it with adequate protection to reimburse it for diminution in the value of its collateral may be broken down into two questions. First, since the decrease in the Trade Value of the Truck exceeded the amount Debtor paid in adequate protection,[24] is Chase entitled to a claim for the difference under section 507(b)? Second, since Chase received no adequate protection for the period between the filing of Debtor's chapter 13 petition and the filing of the APD, (and, hence, the date as of which Adequate Protection Value is determined), is Chase entitled to a claim for deterioration in the value of its collateral during that time pursuant to section 503(b)(1)?

### 1. *Section 507(b)*

██ The court holds that Chase is not entitled to assert a claim under section 507(b) of the Bankruptcy Code. The reason for this is that, even if Chase can invoke section 507(b), the claim of Chase is fully secured.[25]

---

**23.** September 2001 values were not provided by the parties, but the court independently ascertained the September 2001 Trade Value for the Truck. At the November 22 hearing, the court indicated it would take notice of N.A.D.A. Official Used Car Guides

**24.** The Trade Value of the Truck as of November 2002 was $11,075. The Trade Value in September 2001 (the Adequate Protection Value) was $12,825. Thus the Trade Value fell by $1,750. Since Debtor paid only $1,311 in adequate protection, Chase was arguably short-changed $439.

**25.** A claim entitled to priority under section 507(b) may also be secured. Section 507(b) refers back to section 507(a)(1). Section 507(a)(1), which establishes a first priority for administrative expenses, is unlike every other subsection of 507(a) (except section 507(a)(7)) in that it is not limited by its terms to *unsecured* claims. Section 507(a)(1), in turn, refers to section 503(b). Section 503(b)(1), which would apply to a section 507(b) claim such as Chase might hold, not only is not

limited to unsecured claims (compare section 364(a)) but specifically includes under section 503(b)(1)(B) taxes which are likely to be secured pursuant to applicable law. If part of Chase's claim qualifies for treatment under section 507(b), that provision simply provides for priority in payment *vis-à-vis* other, typically unsecured, administrative claims. A secured claim entitled to priority under section 507 will be subject to section 506(a). In the case at bar, as discussed, *infra*, Chase's collateral (the Truck) has sufficient value to cover any part of its claim which might be entitled to priority under section 507(b). Since sections 1322(b)(2) and 1325(a)(5)(B) are not limited to exclude from treatment as a secured claim a claim described in section 507(a)(1) or section 507(b), Chase's entire claim would be subject to treatment under the Plan.

> Chase is not penalized by having any section 507(b) claim treated as secured. Chase's secured claim must be paid in full at *present value*. In chapter 13 a priority claim need only be paid in full over time.

Although the Trade Value of the Truck has dropped more than the adequate protection paid to Chase, the amount the court looks to in determining the value of Chase's collateral under the Plan is the Replacement Value of the Truck, $12,607.50. Since this value is greater than the total of Chase's claim, $11,513.25 (which includes the deficiency in adequate protection payments), Chase would be fully secured following confirmation.

If the Plan provided for surrender of the Truck to Chase,[26] the situation would be different. Then Chase might be entitled to compensation because of protection given by section 507(b).[27] Payment in full over time of the section 507(b) claim would then be required under sections 1322(a)(2) and 1325(a)(1). As it is, any claim Chase has under section 507(b) is subsumed into its secured claim.

### 2. *Section 503(b)(1)*

 Because Chase took the position that it was due adequate protection from the date of Debtor's chapter 13 filing, the parties did not have a full opportunity to address the question of whether Chase has a claim under section 503(b)(1). Such a claim would arguably arise because of diminution of the value of the Truck between the filing of the petition and the filing of the APD—the latter being the date the court holds activates Debtor's obligation to pay adequate protection.

Moreover, this claim (unlike any section 507(b) claim Chase might have) would not be included in the amount Chase will ultimately recover, since the court's valuation of Chase's secured claim explicitly excludes any amount representing depreciation before filing of the APD, and the Plan will provide no return on Chase's unsecured claim. Though the amount of any cost claim Chase might have is small—the $225 difference between the Trade Value in August 2001 and the Trade Value in September 2001—the issue is important. If debtors are required to accrue cost of administration claims with respect to collateral prior to any provision of adequate protection for depreciation of the collateral, in many cases those claims could become a significant element in the rehabilitative process.

A number of courts have addressed this issue. Some have held no such cost claim accrues in ordinary circumstances.[28] Others, looking to the language of section 503(b)(1), have held that a cost claim arises only to the extent that the bankruptcy estate is benefited.[29] Still other courts

---

Section 1322(a)(2) ("The plan shall—(2) provide for the full payment, in deferred cash payments, of all claims entitled to priority under section 507....").

**26.** *See* section 1325(a)(5)(C).

**27.** Also, if the Replacement Value of the Truck were insufficient to cover a deficiency in adequate protection paid, Chase might be able to assert a claim under § 507(b). The court need not reach the issue of whether provision of insufficient adequate protection under ¶ 4a of General Order 98–4 is enough, without action by the secured creditor, to support a claim under section 507(b).

**28.** *See e.g. In re James B. Downing & Co.*, 94 B.R. 515, 522 (Bankr.N.D.Ill.1988); *In re Ad-*

*visory Info. and Management Sys., Inc.*, 50 B.R. 627, 630 (Bankr.M.D.Tenn.1985) (holding that section 503(b) was not intended to provide an administrative expense award to a pre-petition secured lender based on the debtor's post-petition possession and use of collateral). *Cf. In re Briggs Transportation Co.*, 47 B.R. 6, 7 (Bankr.D.Minn.1984) (depreciation of collateral not entitled to section 503(b) treatment due to absence of expense incurred by debtor).

**29.** *See e.g. In re Ralar Distribs.*, 182 B.R. 81, 85 (D.Mass.1995). Estimating the "benefit" derived from collateral would sometimes be a difficult task—e.g., when the collateral is available for use, and so of value, but is not actually used.

have taken a fact-specific position, holding that a cost claim arises only from extraordinary changes in value of the lender's collateral.[30]

The variation in results reached by courts considering this question reflects the absence of any clear guidance in the Bankruptcy Code. Certainly the Code does not definitively provide for accrual of a cost claim between case commencement and the time the bankruptcy court assesses adequate protection. Furthermore, there are hints in the Code that the undersecured creditor is not entitled to such a claim.[31]

First, the drafters of the Code used the phrase "decrease in the value" of an interest in property to describe that which was to be adequately protected.[32] This language is distinct from that used in section 503(b)(1) ("actual, necessary costs and expenses") which suggests the creation of a new, independent obligation.[33] In other

---

**30.** *See e.g. In re Cheatham,* 91 B.R. 382, 385–86 (E.D.N.C.1988); *In re Callister,* 15 B.R. 521, 531–34 (Bankr.D.Utah 1981); *In re Alyucan Interstate Corp.,* 12 B.R. 803, 807–08 (Bankr.D.Utah 1981).

**31.** The underlying basis for protection of the value of a party's interest in property of the estate is the Fifth Amendment to the Constitution. *Tidewater Fin. Co. v. Henson,* 272 B.R. 135, 139–40 (D.Md.2002); *LNC Invs., Inc. v. First Fid. Bank N.A.,* 247 B.R. 38, 44 (S.D.N.Y.2000); *In re Mr. Gatti's,* 164 B.R. 929, 934 (Bankr.W.D.Tex.1994) (quoting *In re Sweetwater,* 40 B.R. 733, 745 (Bankr.D.Utah 1984)); *In re Café Partners/Washington 1983,* 81 B.R. 175, 179 (Bankr.D.C.1988) (same). Thus, the purpose of protecting against a loss of value is to ensure that there is no taking without due process or compensation. A failure to compensate for the period between case commencement and the time the adequate protection issue is reached would not amount to a taking within the meaning of the Fifth Amendment. Any taking occurs through retention of property in derogation of another's rights. Delay of those rights for a brief period until a court may consider the merits of such an entity's rights does not amount to a taking. *In re Boston & Maine Corp.,* 484 F.2d 369, 374 (1st Cir.1973) (long established that secured creditors may be required to defer realizing on security for reasonable time); *Matter of American Kitchen Foods, Inc.,* 1976 WL 23699, 1976 Bankr.LEXIS 6, *17 (Bankr.D. Maine 1976) (collateral impairment problem does not arise under Fifth Amendment absent satisfactory proof of valid obligation on part of debtor, the performance of which is secured by an enforceable right in specific property). *Accord First English Evangelical Lutheran Church v. County of Los Angeles,* 210 Cal.App.3d 1353, 1373, 258 Cal.Rptr. 893 (Cal.Ct.App.1989) (temporary restraint on use of property not necessarily an unconstitutional taking even if permanent imposition of same restraints without compensation might constitute impermissible taking). In a bankruptcy case, a party seeking adequate protection has numerous means for bringing the issue quickly to the court's attention. *See* sections 362(d) and (f) and 363(e).

> In the absence of a constitutional mandate, the basis of any claim Chase might have under section 503(b) must be found in the statute itself. In reading the statute, the court is mindful that Congress did not intend to be liberal in granting administrative priority to claims. *See e.g. In re Enron Corp.,* 279 B.R. 695, 704–05 (Bankr. S.D.N.Y.2002) (minimizing administrative expenses preserves the value of priority for those creditors Congress intended to prefer); *In re Enron Corp.,* 279 B.R. 79, 85 (Bankr.S.D.N.Y.2002) (same). *Accord. Cle-Ware Indus. v. Sokolsky,* 493 F.2d 863, 868 (6th Cir.1974) (policy of Bankruptcy Act, manifest in all of its provisions regarding expenses and fees, is to reduce to a minimum the cost of administering estates). Absent clear legislative intent that a party in Chase's position should have a cost claim, the court, in any event, should be cautious in construing the Bankruptcy Code to grant such preferred status.

**32.** *See* sections 361(1) and (2) and 1205(b)(1) and (2).

**33.** *See,* Black's Law Dictionary, Seventh Edition, 1999 (cost: "amount paid or charged for something; price or expenditure;" expense: "expenditure of money, time, labor or re-

words, reduction in the value of collateral in the ordinary course of time does not create a debt owed by the debtor; it is no more than a lender would expect in connection with any loan secured by property that depreciates in value.[34] This decrease in value is not a "cost or expense." Had Congress intended section 503(b)(1) to reach a decrease in collateral value, it could easily have included those words or a similar formulation in section 503(b)(1).

Light is also cast on Congress's intent by section 922(c). Section 922(c) provides that, in a municipal debt adjustment case, if adequate protection proves deficient, the party protected will receive "an administrative expense [claim] under section 503(b)...." Since sections 361, 362, 364(c) and (d), 503 and 507(a)(1) (unlike section 507(b)) are applicable in chapter 9 cases (see section 901(a)), if depreciation from retention and use of collateral automatically gave rise to an administrative claim in

other chapters, section 922(c) would be redundant. For section 922(c) to have a purpose,[35] depreciation of collateral cannot automatically give rise to an administrative claim.

The specific exclusion of an administrative claim from potential forms of adequate protection in other chapters (sections 361(3) and 1205(b)(4)) is not inconsistent with the court's construction of the statute. While these provisions might be read to suggest that an administrative claim for deterioration of value is automatic, they may as easily be construed to indicate no such claim will exist unless specifically granted. The court finds support for this conclusion in other authorities.

 Specifically, most courts hold that mere retention of a creditor's collateral by the estate, without actual use, does not result in any claim under section 503(b)(1).[36] Sharing this view, the court further holds that, even if the collateral is

---

sources to accomplish a result."). The language of section 364(a) allowing the trustee (in chapter 13, the debtor; section 1303) to "obtain unsecured credit and incur unsecured debt ... allowable under section 503(b)(1) ... as an administrative expense" supports the court's view that section 503(b)(1) pertains to obligations created postpetition.

**34.** Ordinary depreciation is distinguishable from a drop in value caused by the debtor's wrongful conduct. As discussed, *infra*, a secured creditor may be the victim of its debtor's postpetition tort. If, for example, collateral is uninsured and lost through fire or theft, an independent obligation to the secured creditor may arise.

**35.** The court must choose a reading of the statute that gives every provision meaning. *United States v. Nordic Village*, 503 U.S. 30, 36, 112 S.Ct. 1011, 1015, 117 L.Ed.2d 181 (1992); *Hoffman v. Connecticut Dep't of Income Maintenance*, 492 U.S. 96, 103, 109 S.Ct. 2818, 2824, 106 L.Ed.2d 76 (1989).

**36.** *See e.g. Ford Motor Credit v. Dobbins*, 35 F.3d 860, 867 (4th Cir.1994) (mere opportunity to use collateral does not give rise to sec-

tion 503(b)(1)(A) claim); *In re Mid Region Petroleum*, 1 F.3d 1130, 1133 (10th Cir.1993) (mere possession of creditor's collateral by debtor does not give rise to administrative expense); *In re Subscription Television*, 789 F.2d 1530, 1532 (11th Cir.1986) (retained, but unused, leased equipment would not give rise to administrative expense); *In re Enron Corp.*, 279 B.R. 695, 706 (Bankr.S.D.N.Y.2002) (mere possession of claimant's property by debtor does not warrant administrative claim status); *In re Raymond Cossette Trucking, Inc.*, 231 B.R. 80, 84 (Bankr.D.N.D.1999) (if debtor does more than merely retain possession of property and garners benefit from that retention, then section 503(b)(1)(A) "comes into play"); *In re Templeton*, 154 B.R. 930, 933 (Bankr.W.D.Tex.1993) (actual use, not mere possession, is a prerequisite to establishing an administrative priority claim); *Kinnan & Kinnan Partnership v. Agristor Leasing*, 116 B.R. 162, 167 (D.Neb.1990) (retention and control of equipment, without proof of actual and necessary use by the debtor, is insufficient grounds for allowing an administrative expense under section 503(b)(1)(A)).

used by the debtor, no claim arises under section 503(b)(1), at least unless the diminution of the value of the undersecured creditor's collateral exceeds depreciation that would have occurred had the debtor simply retained (but not used) the collateral.

Those courts that would grant a lender, regardless of its failure to act to obtain adequate protection, a cost claim based on the benefit to the estate misperceive the reason for giving the undersecured lender a claim ahead of unsecured creditors in compensation for the debtor's use of the lender's collateral. The intent of the drafters of the Code was to *protect* the secured creditor against deterioration of the value of its collateral.[37] In determining protection, value is determined from the perspective of the *creditor*, not, as was the case presented in *Rash*, from that of the debtor. If the undersecured creditor's collateral falls in value no more by reason of the debtor's use than it would have had the collateral remained idle, the creditor has not been harmed by the debtor's conduct.[38] Until an obligation of the debtor is triggered through sections 362(d), 363(e), 364(d) or otherwise to protect the lender against normal depreciation, the lender will have no right to recompense for that depreciation beyond its ordinary, prepetition creditor status. This is not to say that an estate may not be liable on a cost basis for tortious harm to a creditor's collateral. As *Reading* teaches, an estate representative's post-petition tort gives rise to a claim under section 503(b)(1).[39]

In the case at bar there is no evidence Debtor did anything during the period between the petition date and filing of the APD that caused the value of the Truck to fall more than it would have absent Debtor's use of it. Thus the court holds Chase is not entitled to any claim under section 503(b).

## IV. *Conclusion*

In the Plan, Debtor valued the Truck at $9,540 and proposed (per General Order 98–4, ¶ 4f) that this amount be reduced by her adequate protection payments, with the balance to be paid to Chase with interest. For the reasons stated above, the Plan undervalues the Truck. Thus, confirmation of the Plan as filed must be denied. Debtor is granted leave to amend the Plan to conform to the court's decision.

It is so ORDERED.

---

37. *Accord In re Arms*, 1998 WL 283160, \*3, 1998 Bankr.LEXIS 651, \*9 (Bankr.D.Vt.1998) (citing 124 Cong Rec H11107 (daily ed. Sept. 28, 1978); S17423 (daily ed. Oct. 6, 1978; remarks of Rep. Edwards and Sen. DeConcini)).

38. *Cf. Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968). In *Reading*, it was alleged (and ultimately held by the Court) that a post-petition tort could give rise to an administrative expense claim. The *Reading* Court's reasoning was that the tort constituted something outside the ordinary conduct of the debtor's business, and that, therefore, its extraordinary nature elevated the victims above general unsecured claimants in the priority scheme. Likewise, if a creditor's collateral suffers no more depreciation in the debtor's hands than it would otherwise (i.e. nothing beyond what would be expected in the ordinary course), a reasonable reading of *Reading* militates against awarding the creditor with a cost claim for whatever depreciation occurs.

39. *Reading*, 391 U.S. at 485, 88 S.Ct. 1759.